















JPP   7/6/01   15:27

3:01-CV-01206   BANC OF AMERICA V. APOLLO FISHERIES

*1*

*CMP.*

ORIGINAL

01 JUL -5 PM 4:01

1 PILLSBURY WINTHROP LLP
JENNIE L. LA PRADE # 82224
2 725 South Figueroa Street, Suite 2800
Los Angeles, CA  90017-5406
3 Telephone:  (213) 488-7100
Facsimile:  (213) 629-1033
4

5 PILLSBURY WINTHROP LLP
RICHARD M. SEGAL #156975
6 MICHELLE L. ADAMS #198956
101 West Broadway, Suite 1800
7 San Diego, CA  92101-8219
Telephone:  (619) 234-5000
8 Facsimile:  (619) 236-1995

9    Attorneys for Plaintiff
BANC OF AMERICA SPECIALTY FINANCE, INC.

10

11              UNITED STATES DISTRICT COURT

12            SOUTHERN DISTRICT OF CALIFORNIA

13

14 _____          '01 CV  1206 BTM (LSP)
                                    )
15 BANC OF AMERICA SPECIALTY        )    Case No.
   FINANCE, INC., a North Carolina  )
16 Corporation, successor-in-interest and )
   formerly known as NATIONSCREDIT )    COMPLAINT FOR:
17 COMMERCIAL CORPORATION OF        )
   AMERICA,                         )    1.  BREACH OF INVENTORY
18                                  )        AGREEMENT;
                       Plaintiff,   )    2.  MONEY LENT;
19                                  )    3.  BREACH OF SECURITY
        vs.                         )        AGREEMENT AND
20                                  )        POSSESSION OF PERSONAL
   APOLLO FISHERIES SERVICE, INC. dba )        PROPERTY;
21 BLUE PORPOISE MARINE; NATALIE    )    4.  BREACH OF GUARANTY;
   CINTAS-GLADNICK, an individual, and )    5.  BREACH OF RETAIL
22 RONALD GLADNICK, an individual,  )        CONTRACT;
                                    )    6.  FRAUD; AND
23                     Defendants.  )    7.  INJUNCTIVE RELIEF
   _____)

24

25

26

27

28

50141985v1                          - 1 -

                                                        COMPLAINT

1    Plaintiff BANC OF AMERICA SPECIALTY FINANCE, INC., a North Carolina

2  corporation ("Specialty Finance"), successor-in-interest to NATIONSCREDIT

3  COMMERCIAL CORPORATION OF AMERICA ("NationsCredit"), alleges as follows:

4                    JURISDICTION AND VENUE

5    1.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1332(a) in

6  that diversity of citizenship exists between the parties and the amount in controversy

7  exceeds $75,000.00, exclusive of interest and costs.

8    2.    Venue is proper within this district pursuant to 28 U.S.C. §§ 1391 because

9  the claims set forth in this Complaint arose within this district and one or more of the

10  defendants reside in this judicial district.

11                    PRELIMINARY ALLEGATIONS

12    3.    Specialty Finance is, and at all times relevant hereto has been, a

13  corporation duly organized and existing by virtue of the laws of the State of North

14  Carolina with its principal place of business in Georgia.  Specialty Finance is authorized

15  to do business and is doing business in the County of San Diego, State of California.

16    4.    Specialty Finance is informed and believes, and on that basis alleges, that

17  Defendant APOLLO FISHERIES SERVICE, INC. dba BLUE PORPOISE MARINE

18  ("Blue Porpoise") is and at all times herein mentioned has been, a corporation duly

19  organized and existing by virtue of the laws of the State of California and doing business

20  in the County of San Diego, State of California.  Blue Porpoise is in the business of

21  purchasing inventory of major marine products and reselling them to consumers.

22    5.    Specialty Finance is informed and believes, and on that basis alleges, that

23  Defendant NATALIE CINTAS-GLADNICK is and at all times herein mentioned has

24  been, an individual residing in the County of San Diego, State of California.

25    6.    Specialty Finance is informed and believes, and on that basis alleges, that

26  Defendant RONALD GLADNICK is and at all times herein mentioned has been, an

27  individual residing in the County of San Diego, State of California.

28

1                    THE INVENTORY AGREEMENT AND THE COLLATERAL

2        7.      On or about July 29, 1997, Specialty Finance, formerly known as

3   NationsCredit, began financing the purchase of inventory by Blue Porpoise for sale by

4   Blue Porpoise in the ordinary course of its business.

5        8.      On or about July 29, 1997, Specialty Finance on the one hand, and Blue

6   Porpoise, through its president, Natalie Cintas-Gladnick, on the other hand, entered into a

7   written "Security Agreement – Inventory" ("Agreement").  A true and correct copy of the

8   Agreement is attached hereto as Exhibit 1 and is incorporated herein by this reference.

9        9.      Pursuant to the Agreement, Specialty Finance agreed to finance Blue

10  Porpoise's purchase of inventory by extending credit to Blue Porpoise in such amounts as

11  Specialty Finance, in its sole discretion, would decide to grant.  Pursuant to the terms of

12  the Agreement, Blue Porpoise promised to repay Specialty Finance the amount of funds

13  advanced by Specialty Finance toward inventory purchases by Blue Porpoise, according

14  to the terms prescribed in the Agreement.  Under the Agreement, Blue Porpoise is

15  required to pay its obligations when due as indicated on any statement submitted to it by

16  Specialty Finance, and in any event pay a manufacturer's invoice in full when the unit is

17  sold by Blue Porpoise or when the unit is deemed mature, 360 to 365 days after the date

18  of the manufacturer's invoice.  Failure to pay an obligation when due or manufacturer's

19  invoice in a timely manner following the sale of Specialty Finance-financed inventory

20  constitutes a default under the Agreement.  Additionally, Blue Porpoise is obligated to

21  pay interest on matured amounts at the rate of up to15% per annum, or as otherwise set

22  forth in the periodic invoices.

23       10.     In consideration of Specialty Finance entering into the Agreement, Natalie

24  Cintas-Gladnick and Ronald Gladnick each personally executed a guaranty agreement

25  ("Guaranty"), guaranteeing the obligations of Blue Porpoise to Specialty Finance.  True

26  and correct copies of the Guaranties of Natalie Cintas-Gladnick and Ronald Gladnick are

27  attached hereto as Exhibit 2 and are incorporated herein by this reference.

28

50141985v1                                - 3 -

                                                                    COMPLAINT

1    11.   Under the Agreement, Blue Porpoise granted to Specialty Finance a

2   security interest in all of Blue Porpoise's inventory and other personal property (the

3   "Collateral") to secure payment of all indebtedness due to Specialty Finance from Blue

4   Porpoise under the Agreement.  The Agreement defines inventory to include, among

5   other things:

6             "All of the Debtor's inventory, equipment, accounts,
             contract rights (including but not limited to any purchase
7             and rental agreements), chattel paper, documents and
             general intangibles, of whatever kind or nature, wherever
8             located, now owned or hereafter acquired, and all returns,
             repossessions, substitutions, replacements, parts, additions
9             and accessions, thereto and thereof, and all proceeds
             (including but not limited to cash, instruments, chattel
10            paper, general intangibles and accounts) and products
             thereof."
11

12   See Exhibit 1.

13    12.   In order to perfect its security interest in the Collateral, Specialty Finance

14   recorded an executed UCC-1 Financing Statement with the Office of the California

15   Secretary of State on August 22, 1997.  Said financial statement was subsequently

16   amended on March 11, 1999.  A true and correct copy of said UCC-1 financing statement

17   (the "Financing Statement"), including a copy of the amendment, is attached hereto as

18   Exhibit 3 and incorporated herein by this reference.

19    13.   Specialty Finance has advanced funds to Blue Porpoise for the purchase of

20   inventory and Specialty Finance has performed all other terms and conditions of the

21   Agreement on its part to be performed.

22    14.   Pursuant to the terms of the Agreement, failure by Blue Porpoise to fulfill

23   any of its promises or obligations to Specialty Finance constitutes a default under the

24   Agreement thereby entitling Specialty Finance, at Specialty Finance's election, without

25   notice, to declare all sums owed under the Agreement at once due and payable, and

26   giving Specialty Finance all of the rights and remedies of a secured party under the

27   applicable provisions of the Uniform Commercial Code.

28

1    15.    Blue Porpoise has failed to perform its obligations under the Agreement

2  by, among other things, failing and refusing, and continuing to fail and refuse, to repay to

3  Specialty Finance the amounts due and owing under the Agreement, including its failure

4  to pay for matured items financed by Specialty Finance.  As a result of Blue Porpoise's

5  default, Specialty Finance has demanded, and hereby demands, that Blue Porpoise pay

6  the entire outstanding indebtedness.

7    16.    Pursuant to the terms of the Agreement, Blue Porpoise agreed to pay all

8  costs of collection including, but not limited to, reasonable attorneys' fees and legal

9  expenses incurred by Specialty Finance to enforce the Agreement and to pursue its rights

10  as a secured party with respect to Specialty Finance's Collateral.

11    17.    As a result of Blue Porpoise's breach of the Agreement, there is presently

12  due, owing and unpaid from Blue Porpoise to Specialty Finance under the Agreement the

13  principal amount of $234,475.00; which includes past-due curtailment amounts through

14  to June 27, 2001 in the amount of $3,946.39; together with accrued and past-due interest

15  thereon through and including May 31, 2001 in the amount of $2,826.92; together with

16  interest accruing from May 31, 2001 until the amounts owed by Blue Porpoise to

17  Specialty Finance under the Agreement are paid in full; together with all costs and

18  reasonable attorneys' fees incurred or to be incurred to enforce the Agreement; together

19  with all other charges and fees due under the terms of the Agreement; less the value

20  obtained after the commercially reasonable disposition of all Collateral repossessed from

21  Blue Porpoise.

22    18.    Pursuant to the terms of the Agreement, Specialty Finance is entitled to

23  immediate and exclusive possession of the Collateral.

24                          <u>THE RETAIL CONTRACT</u>

25    19.    On or about May 1, 2000, Blue Porpoise assigned to Specialty Finance

26  and Specialty Finance purchased from Blue Porpoise ("Assignment") a Security

27  Agreement and Disclosures Statement dated as of May 1, 2000, entered into by and

28  between Blue Porpoise and Jerry and Joellen Saline ("Salines") relating to the retail

1   purchase and financing by the Salines of a 1999 Albermarle 320 Express, Hull Number

2   XWR32118E899 ("Contract").  A true and correct copy of the Contract, together with the

3   Assignment, is attached hereto as Exhibit 4.

4        20.     Specialty Finance purchased the Contract pursuant to the "NCCC Terms

5   and Conditions of Contract Purchases and Reserve Transactions" entered into between

6   Blue Porpoise and Specialty Finance on or about November 14, 1996.  A true and correct

7   copy of the Terms and Conditions is attached here to as Exhibit 5.

8        21.     Pursuant to its Assignment of the Contract, Blue Porpoise made certain

9   warranties including:  (1) that the Contract is the result of a sale of Blue Porpoise's own

10  property; (2) that Blue Porpoise has full and perfect title to and right to this Contract free

11  of any encumbrances, lien, or any interest of third parties of any nature whatsoever; (3)

12  that this Contract accurately and correctly reflects a genuine, bona fide sale and the price

13  and terms thereof, and is valid and in compliance with any applicable installment sales

14  law or other applicable state or federal law or administrative regulation; (4) that the goods

15  or services covered by this Contract have been unconditionally accepted by the parties to

16  the services covered by the parties to the Contract; (5) that the amount due from the

17  obligor is not disputed or subject to any set-off, deduction, credit or counterclaim; and (6)

18  that there are no valid defenses in law or equity to the Contract as it exists in the hands of

19  the Specialty Finance after this conveyance.

20       22.     Specialty Finance has since learned that the foregoing warranties were not

21  true when made due to the following:  (1) title to the boat was not in the name of Blue

22  Porpoise but a principal of Blue Porpoise; (2) the boat was subject to a mortgage held by

23  Boston Whaler Financial Services in the amount of approximately $230,000, and such

24  mortgage has not been released as of the date of the assignment or subsequently; and (c)

25  the Salines dispute the legality and validity of the purchase of the boat and the Contract

26  and had asserted various defenses to the enforcement of the Contract.

27

28

COMPLAINT

1    23.    Pursuant to the Assignment, if any of the warranties are untrue, Blue
2    Porpoise will be determined to have defaulted on the Assignment and is required to
3    repurchase the Contract on demand for the remaining unpaid balance.

4    24.    As a result of Blue Porpoise's default, Specialty Finance has demanded,
5    and hereby demands, that Blue Porpoise repurchase the Contract for the full purchase
6    price in the amount of $165,049.

7    25.    Pursuant to the terms of the Assignment, Blue Porpoise has also agreed to
8    pay all costs of collection including, but not limited to, reasonable attorneys' fees and
9    legal expenses incurred by Specialty Finance to enforce the Assignment and to pursue its
10    rights.

11    26.    As a result of Blue Porpoise's breach of the Assignment, there is presently
12    due, owing and unpaid from Blue Porpoise to Specialty Finance the amount of $165,049;
13    together with interest accruing from May 1, 2000 until the amounts owed by Blue
14    Porpoise to Specialty Finance under the Assignment are paid in full; together with all
15    costs and reasonable attorneys' fees incurred or to be incurred to enforce the Assignment;
16    together with all other charges and fees due under the terms of the Assignment.

17                            FIRST CLAIM FOR RELIEF

18                     (For Breach of Agreement Against Blue Porpoise)

19    27.    Specialty Finance refers to paragraphs 1 through 18 above and hereby
20    incorporates said paragraphs by reference as though fully set forth herein.

21    28.    Specialty Finance has advanced funds to Blue Porpoise for the purchase of
22    inventory and Specialty Finance has performed all other terms and conditions of the
23    Agreement on its part to be performed.

24    29.    Blue Porpoise has breached the Agreement by, among other things, failing
25    to repay the amounts due and owing to Specialty Finance under the Agreement, including
26    its failure to pay for matured items financed by Specialty Finance.

27    30.    Although Specialty Finance has demanded, and hereby demands, payment
28    of all principal, interest, fees, costs of collection and other amounts owing pursuant to the

1   Agreement, Blue Porpoise has failed and refused, and continues to fail and refuse, to

2   repay the amounts owing under the Agreement.

3       31.     As a result of Blue Porpoise's breach of the Agreement, there is presently

4   due, owing and unpaid from Blue Porpoise to Specialty Finance under the Agreement the

5   principal amount of $234,475.00; which includes past-due curtailment amounts through

6   to June 27, 2001 in the amount of $3,946.39; together with accrued interest thereon

7   through and including May 31, 2001 in the amount of $2,826.92; together with interest

8   accruing from May 31, 2001 until the amounts owed by Blue Porpoise to Specialty

9   Finance on the Agreement is paid in full; together with all costs and reasonable attorneys'

10  fees incurred or to be incurred to enforce the Agreement; together with all other charges

11  and fees due under the terms of the Agreement; less the value obtained after the

12  commercially reasonable disposition of all inventory repossessed from Blue Porpoise.

13                      SECOND CLAIM FOR RELIEF

14                  (For Money Lent Against Blue Porpoise)

15      32.     Specialty Finance refers to paragraphs 1 through 18 and 27 through 31

16  above and hereby incorporates said paragraphs by reference as though fully set forth

17  herein.

18      33.     Within the last two (2) years in San Diego County, California, Blue

19  Porpoise became indebted to Specialty Finance in the principal amount of $234,475.00,

20  together with interest, service charges and fees thereon for money lent by Specialty

21  Finance to said defendants at their request.

22      34.     Although Specialty Finance has demanded payment in full from Blue

23  Porpoise, there is presently due, owing and unpaid to Specialty Finance the principal

24  amount of $234,475.00; which includes past-due curtailment amounts through to June 27,

25  2001 in the amount of $3,946.39; together with accrued interest thereon through and

26  including May 31, 2001 in the amount of $2,826.92; together with interest accruing from

27  May 31, 2001 until the amounts owed by Blue Porpoise to Specialty Finance on the

28  Agreement are paid in full; together with all costs and reasonable attorneys' fees incurred

COMPLAINT

1   or to be incurred to enforce the Agreement; together with all other charges and fees due

2   under the terms of the Agreement; less the value obtained after the commercially

3   reasonable disposition of all inventory repossessed from Blue Porpoise.

4                                    <u>THIRD CLAIM FOR RELIEF</u>

5                              (For Breach of Security Agreement Against Blue Porpoise)

6         35.        Specialty Finance refers to paragraphs 1 through 34 above and hereby

7   incorporates said paragraphs by reference as though fully set forth herein.

8         36.        In order to secure payment and performance of any and all of Blue

9   Porpoise's indebtedness, liabilities and obligations to Specialty Finance, the Agreement

10  contains a security agreement wherein Blue Porpoise granted Specialty Finance a security

11  interest in, *inter alia*, the Collateral, as described above.

12        37.        In order to perfect its security interest in the Collateral, Specialty Finance

13  filed the Financing Statement with the Office of the California Secretary of State.

14        38.        Specialty Finance has performed all terms and conditions of the

15  Agreement on its part to be performed.

16        39.        Specialty Finance has demanded, and hereby demands, that Blue Porpoise

17  perform it obligations under the Agreement and deliver the Collateral to Specialty

18  Finance.

19        40.        Blue Porpoise has breached the Agreement by, *inter alia*, failing and

20  refusing, and continuing to fail and refuse, to repay the amounts owed under the

21  Agreement, and by failing and refusing, and continuing to fail and refuse, to deliver sole

22  and exclusive possession of all of the Collateral to Specialty Finance.  Blue Porpoise is

23  unlawfully detaining the Collateral by retaining possession of the Collateral despite

24  Specialty Finance's demands.

25        41.        Pursuant to the terms of the Agreement, Specialty Finance is entitled to

26  immediate and exclusive possession of the Collateral.

27        42.        The Agreement provides that Blue Porpoise will pay all costs of

28  collection, including reasonable attorneys' fees and legal expenses, incurred by Specialty

1    Finance to enforce the Agreement and to pursue its rights as a secured party with respect

2    to the Collateral.

3                      <u>FOURTH CLAIM FOR RELIEF</u>

4              (For Breach Of Guaranty Against Natalie Cintas-Gladnick)

5       43.      Specialty Finance refers to paragraphs 1 through 42 above and hereby

6    incorporates said paragraphs by reference as though fully set forth herein.

7       44.      In order to guarantee Blue Porpoise's performance and payment of all

8    obligations under any present or future agreement with Specialty Finance, Natalie Cintas-

9    Gladnick personally made, executed and delivered to Specialty Finance the Guaranty

10    dated as of July 29, 1997, a true and correct copy of which is attached hereto as Exhibit 3.

11       45.      Pursuant to the terms of the Guaranty, Natalie Cintas-Gladnick guaranteed

12    the prompt payment of any and all indebtedness of Blue Porpoise owed to Specialty

13    Finance under any agreements with Specialty Finance.

14       46.      The Guaranty has not been amended, revoked, or rescinded, and remains

15    in full force and effect in accordance with its original terms.

16       47.      Specialty Finance has financed the acquisition of inventory by Blue

17    Porpoise in accordance with the Agreement, and Specialty Finance has performed all of

18    the terms and conditions of the Agreement on its part to be performed. Specialty Finance

19    has also advanced funds to Blue Porpoise pursuant to the Assignment and has performed

20    all of the terms and conditions of the Assignment on its part to be performed.

21       48.      Blue Porpoise has breached the Agreement and the Assignment by, *inter*

22    *alia*, failing and refusing, and continuing to fail and refuse, to repay the full amounts

23    owing to Specialty Finance on the Agreement and under the Assignment.

24       49.      Although Specialty Finance has demanded performance by Blue Porpoise,

25    Blue Porpoise has failed and refused, and continues to fail and refuse, to repay the

26    amounts owing on the Agreement and under the Assignment.

27

28

1      50.      Because Blue Porpoise has defaulted on the Agreement and the

2 Assignment, Specialty Finance has demanded, and hereby demands, that Natalie Cintas-

3 Gladnick honor the Guaranty.

4      51.      Natalie Cintas-Gladnick has breached the Guaranty by, *inter alia*, failing

5 and refusing, and continuing to fail and refuse, to repay all amounts owing by Blue

6 Porpoise to Specialty Finance under the Agreement and the Assignment.

7      52.      As a result of Natalie Cintas-Gladnick's breach of the Guaranty, there is

8 presently due, owing and unpaid from Natalie Cintas-Gladnick to Specialty Finance

9 under the Guaranty the principal amount of $399,524.00; which includes past-due

10 curtailment amounts through to June 27, 2001 in the amount of $3,946.39; together with

11 accrued interest charges through May 31, 2001 in the amount of $2,826.92; together with

12 interest from May 31, 2001 until the amounts owed by Blue Porpoise to Specialty

13 Finance on the Agreement and the Assignment are paid in full; together with all costs and

14 reasonable attorneys' fees incurred or to be incurred to enforce the Agreement and

15 Assignment; together with all other charges and fees due under the terms of the

16 Agreement and Assignment; less the value obtained after the commercially reasonable

17 disposition of all inventory repossessed from Blue Porpoise.

18                      <u>FIFTH CLAIM FOR RELIEF</u>

19               (For Breach Of Guaranty Against Ronald Gladnick)

20      53.      Specialty Finance refers to paragraphs 1 through 52 above and hereby

21 incorporates said paragraphs by reference as though fully set forth herein.

22      54.      In order to guarantee Blue Porpoise's performance and payment of all

23 obligations under any present or future agreement with Specialty Finance, Ronald

24 Gladnick personally made, executed and delivered to Specialty Finance the Guaranty

25 dated as of July 29, 1997, a true and correct copy of which is attached hereto as Exhibit 3.

26      55.      Pursuant to the terms of the Guaranty, Ronald Gladnick guaranteed the

27 prompt payment of any and all indebtedness of Blue Porpoise owed to Specialty Finance

28 under any agreements with Specialty Finance.

COMPLAINT

1    56.    The Guaranty has not been amended, revoked, or rescinded, and remains
2  in full force and effect in accordance with its original terms.

3    57.    Specialty Finance has financed the acquisition of inventory by Blue
4  Porpoise in accordance with the Agreement, and Specialty Finance has performed all of
5  the terms and conditions of the Agreement on its part to be performed.  Specialty Finance
6  has also advanced funds to Blue Porpoise pursuant to the Assignment and has performed
7  all of the terms and conditions of the Assignment on its part to be performed.

8    58.    Blue Porpoise has breached the Agreement and the Assignment by, *inter*
9  *alia*, failing and refusing, and continuing to fail and refuse, to repay the full amounts
10  owing to Specialty Finance on the Agreement and under the Assignment.

11    59.    Although Specialty Finance has demanded performance by Blue Porpoise,
12  Blue Porpoise has failed and refused, and continues to fail and refuse, to repay the
13  amounts owing on the Agreement and under the Assignment.

14    60.    Because Blue Porpoise has defaulted on the Agreement and the
15  Assignment, Specialty Finance has demanded, and hereby demands, that Ronald
16  Gladnick honor the Guaranty.

17    61.    Ronald Gladnick has breached the Guaranty by, *inter alia*, failing and
18  refusing, and continuing to fail and refuse, to repay all amounts owing by Blue Porpoise
19  to Specialty Finance under the Agreement and the Assignment.

20    62.    As a result of Ronald Gladnick's breach of the Guaranty, there is presently
21  due, owing and unpaid from Ronald Gladnick to Specialty Finance under the Guaranty
22  the principal amount of $399,524.00; which includes past-due curtailment amounts
23  through to June 27, 2001 in the amount of $3,946.39; together with accrued interest
24  charges through May 31, 2001 in the amount of $2,826.92; together with interest from
25  May 31, 2001 until the amounts owed by Blue Porpoise to Specialty Finance on the
26  Agreement and the Assignment are paid in full; together with all costs and reasonable
27  attorneys' fees incurred or to be incurred to enforce the Agreement and Assignment;
28  together with all other charges and fees due under the terms of the Agreement and

1 Assignment; less the value obtained after the commercially reasonable disposition of all

2 inventory repossessed from Blue Porpoise.

3                              SIXTH CLAIM FOR RELIEF

4                    (Breach of Retail Contract Against Blue Porpoise)

5       63.     Specialty Finance refers to paragraphs 1 through 62 above and hereby

6 incorporates said paragraphs by reference as though fully set forth herein.

7       64.     Specialty Finance has advanced funds to Blue Porpoise for the purchase of

8 the Assignment of the Security Agreement and Disclosures Statement relating to the

9 purchase and financing by the Salines of a 1999 Albermarle 320 Express ("Contract").

10 Specialty Finance has performed all other terms and conditions of the Assignment on its

11 part to be performed.

12      65.     Blue Porpoise has breached the Assignment by, among other things,

13 making certain warranties that were inaccurate and untrue when made.

14      66.     Although Specialty Finance has demanded, and hereby demands, the

15 repurchase of the Contract including payment of all principal, interest, fees, costs of

16 collection and other amounts owing pursuant to the Assignment, Blue Porpoise has failed

17 and refused, and continues to fail and refuse, to repay the amounts owing under the

18 Assignment.

19      67.     As a result of Blue Porpoise's breach of the Assignment, there is presently

20 due, owing and unpaid from Blue Porpoise to Specialty Finance under the Assignment

21 the principal amount of $165,049; together with interest accruing from May 1, 2000 until

22 the amount owed by Blue Porpoise to Specialty Finance on the Assignment is paid in

23 full; together with all costs and reasonable attorneys' fees incurred or to be incurred to

24 enforce the Assignment; together with all other charges and fees due under the terms of

25 the Assignment.

26

27

28

1    SEVENTH CLAIM FOR RELIEF

2    (Fraud against Blue Porpoise, Natalie Cintas-Gladnick and Ronald Gladnick)

3    68.    Specialty Finance refers to paragraphs 1 through 67 above and hereby

4    incorporates said paragraphs by reference as though fully set forth herein.

5    69.    In connection with the assignment of the Security Agreement and

6    Disclosures Statement relating to the purchase and financing by the Salines of the 1999

7    Albermarle 320 Express, Blue Porpoise, by and through its representatives Natalie

8    Cintas-Gladnick and Ronald Gladnick, made certain warranties and representations to

9    Specialty Finance including the following:  (1) that the Contract is the result of a sale of

10    Blue Porpoise's own property; (2) that Blue Porpoise has full and perfect title to and right

11    to this Contract free of any encumbrances, lien, or any interest of third parties of any

12    nature whatsoever; (3) that this Contract accurately and correctly reflects a genuine, bona

13    fide sale and the price and terms thereof, and is valid and in compliance with any

14    applicable installment sales law or other applicable state or federal law or administrative

15    regulation; (4) that the goods or services covered by this Contract have been

16    unconditionally accepted by the parties to the services covered by the parties to the

17    Contract; (5) that the amount due from the obligor is not disputed or subject to any set-

18    off, deduction, credit or counterclaim; and (6) that there are no valid defenses in law or

19    equity to the Contract as it exists in the hands of the Specialty Finance after this

20    conveyance.

21    70.    Pursuant to the terms and conditions of the Assignment and in reliance on

22    defendants' promises and representations, Specialty Finance purchased the Contract from

23    Blue Porpoise for the amount of $165,049.

24    71.    At the time the defendants made these promises and representations to

25    Specialty Finance, they had no intention of performing them and knew or should have

26    known they were false.

27    72.    Defendants made the false representations with the intent to induce

28    Specialty Finance to purchase the Contract from Blue Porpoise.

1      73.     Specialty Finance has learned that the foregoing warranties and

2  representations were in fact false when made.  The true facts are that (1) title to the boat

3  was not in the name of Blue Porpoise but a principal of Blue Porpoise; (2) the boat was

4  subject to a mortgage held by Boston Whaler Financial Services in the amount of

5  approximately $230,000, and such mortgage has not been released as of today's date; and

6  (c) the Salines dispute the legality and validity of the purchase of the boat and the

7  Contract and have asserted various defenses to the enforcement of the Contract.

8      74.     At the time these representations were made, Specialty Finance was

9  ignorant of the falsity of Defendants' representations and believed them to be true.

10     75.     Specialty Finance reasonably and justifiably relied on defendants' false

11  promises and representations in purchasing the Contract.

12     76.     As a proximate result of Defendants' fraudulent conduct, Specialty

13  Finance has been damaged in a sum yet to be ascertained but which Specialty Finance is

14  informed and believes to be in excess of $165,049; excluding interest and costs.

15  Specialty Finance will seek leave to amend this Complaint when the full amount of the

16  damage has been ascertained.

17     77.     Defendants' conduct described herein was done with a conscious

18  disregard of Specialty Finance's rights and with the intent to vex, injure or annoy

19  Specialty Finance such as to constituted oppression, fraud, or malice entitling Specialty

20  Finance to recover punitive damages in an amount appropriate to punish or set an

21  example for the conduct of Defendants.

22                      EIGHTH CLAIM FOR RELIEF

23                (For Injunctive Relief Against Blue Porpoise)

24     78.     Specialty Finance refers to paragraphs 1 through 77 above and hereby

25  incorporates said paragraphs by reference as though fully set forth herein.

26     79.     As set forth in the First through Third Claims for Relief, Blue Porpoise has

27  engaged in a course of conduct in breach of the Agreement. By its conduct, Blue

28

COMPLAINT

1   Porpoise intends to deprive, and will deprive, Specialty Finance of all of its rights under

2   the Agreement.

3        80.     If Blue Porpoise is not enjoined from engaging in certain conduct, as

4   described above, Specialty Finance will suffer irreparable injury for which there is no

5   adequate remedy at law.  Pursuant to Federal Rule of Civil Procedure 65, injunctive relief

6   is warranted.

7        81.     Accordingly, Specialty Finance requests that this Court enter the following

8   injunctive relief:

9            (a)     Order Blue Porpoise and its officers, directors, shareholders,

10           agents, managers, employees, attorneys, accountants, and all other persons with

11           actual or constructive knowledge of the injunctive relief, and each of them

12           (collectively referred to as the "Blue Porpoise Parties") to grant Specialty Finance

13           and its representatives immediate access to the Blue Porpoise places of business

14           in order to audit the Collateral and review Blue Porpoise's books and records,

15           including, but not limited to, all books and records evidencing the inventory and

16           accounts receivable;

17           (b)     Order the Blue Porpoise Parties to turn over to Specialty Finance

18           all books and records of Blue Porpoise, including but not limited to all books and

19           records evidencing the inventory and the accounts receivable;

20           (c)     Enjoin the Blue Porpoise Parties from transferring, selling,

21           pledging, or otherwise disposing of any of the Collateral;

22           (d)     Enjoin the Blue Porpoise Parties from utilizing Blue Porpoise's

23           bank accounts;

24           (e)     Place a freeze on Blue Porpoise's bank accounts at the institutions

25           where those bank accounts are located;

26           (f)     Enjoin the Blue Porpoise Parties from collecting the accounts

27           receivable; and

28

1        (g)    Disallow any and all shipments from leaving their respective

2    locations, except in favor of Specialty Finance.

3    WHEREFORE, Specialty Finance prays for judgment as follows:

4    1.    On its First Claim For Relief against Blue Porpoise, for the principal

5    amount of $234,475.00; which includes past-due curtailment amounts through to June 27,

6    2001 in the amount of $3,946.39; together with accrued interest charges through May 31,

7    2001 in the amount of $2,826.92; together with interest from May 31, 2001 until the

8    amounts owed by Blue Porpoise to Specialty Finance on the Agreement are paid in full;

9    together with all costs and reasonable attorneys' fees incurred or to be incurred to enforce

10    the Agreement; together with all other charges and fees due under the terms of the

11    Agreement; less the value obtained after the commercially reasonable disposition of all

12    inventory repossessed from Blue Porpoise.

13    2.    On its Second Claim For Relief against Blue Porpoise, for the principal

14    amount of $234,475.00; which includes past-due curtailment amounts through to June 27,

15    2001 in the amount of $3,946.39; together with accrued interest charges through May 31,

16    2001 in the amount of $2,826.92; together with interest from May 31, 2001 until the

17    amounts owed by Blue Porpoise to Specialty Finance on the Agreement are paid in full;

18    together with all costs and reasonable attorneys' fees incurred or to be incurred to enforce

19    the Agreement; together with all other charges and fees due under the terms of the

20    Agreement; less the value obtained after the commercially reasonable disposition of all

21    inventory repossessed from Blue Porpoise.

22    3.    On its Third Claim For Relief against Blue Porpoise, for the immediate

23    delivery to Specialty Finance of the Collateral, and for immediate and exclusive

24    possession of the Collateral.

25    4.    On its Fourth Claim For Relief against Natalie Cintas-Gladnick, for the

26    principal amount of $399,524.00; which includes past-due curtailment amounts through

27    to June 27, 2001 in the amount of $3,946.39; together with accrued interest charges

28    through May 31, 2001 in the amount of $2,826.92; together with interest from May 31,

COMPLAINT

1  2001 until the amounts owed by Blue Porpoise to Specialty Finance on the Agreement

2  are paid in full; together with all costs and reasonable attorneys' fees incurred or to be

3  incurred to enforce the Agreement; together with all other charges and fees due under the

4  terms of the Agreement; less the value obtained after the commercially reasonable

5  disposition of all inventory repossessed from Blue Porpoise.

6       5.      On its Fifth Claim For Relief against Ronald Gladnick, for the principal

7  amount of $399,524.00; which includes past-due curtailment amounts through to June 27,

8  2001 in the amount of $3,946.39; together with accrued interest charges through May 31,

9  2001 in the amount of $2,826.92; together with interest from May 31, 2001 until the

10  amounts owed by Blue Porpoise to Specialty Finance on the Agreement are paid in full;

11  together with all costs and reasonable attorneys' fees incurred or to be incurred to enforce

12  the Agreement; together with all other charges and fees due under the terms of the

13  Agreement; less the value obtained after the commercially reasonable disposition of all

14  inventory repossessed from Blue Porpoise.

15       6.      On its Sixth Claim For Relief against Blue Porpoise for breach of contract,

16  for the principal amount of $165,049.00; together with interest from May 1, 2000 until

17  the amounts owed by Blue Porpoise to Specialty Finance are paid in full; together with

18  all costs and reasonable attorneys' fees incurred or to be incurred to enforce the

19  Assignment; together with all other charges and fees due under the terms of the

20  Assignment.

21       7.      On its Seventh Claim For Relief against defendants, for general and

22  special damages in amounts in accordance with proof at trial, together with punitive

23  damages.

24       8.      On its Eighth Claim For Relief against Blue Porpoise, that this Court grant

25  the following injunctive relief:

26            (a)    Order Blue Porpoise and its officers, directors, shareholders,

27       agents, managers, employees, attorneys, accountants, and all other persons with

28       actual or constructive knowledge of the injunctive relief, and each of them

1    (collectively referred to as the "Blue Porpoise Parties") to grant Specialty Finance

2    and its representatives immediate access to the Blue Porpoise places of business

3    in order to audit the Collateral and review Blue Porpoise's books and records,

4    including, but not limited to, all books and records evidencing the inventory and

5    accounts receivable;

6        (b)    Order the Blue Porpoise Parties to turn over to Specialty Finance

7    all books and records of Blue Porpoise, including but not limited to all books and

8    records evidencing the inventory and the accounts receivable;

9        (c)    Enjoin the Blue Porpoise Parties from transferring, selling,

10   pledging, or otherwise disposing of any of the Collateral;

11       (d)    Enjoin the Blue Porpoise Parties from utilizing Blue Porpoise's

12   bank accounts;

13       (e)    Place a freeze on Blue Porpoise's bank accounts at the institutions

14   where those bank accounts are located;

15       (f)    Enjoin the Blue Porpoise Parties from collecting the accounts

16   receivable; and

17       (g)    Disallow any and all shipments from leaving their respective

18   locations, except in favor of Specialty Finance.

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# SECURITY AGREEMENT - INVENTORY

1    PARTIES - The parties to this Security Agreement are **NationsCredit Commercial Corporation of America** _____(hereinafter ·Secured Party·) and **Apollo Fisheries Service, Inc. dba Blue Porpoise Marine** _____ (hereinafter 'Dealer')

2    ADVANCES - Dealer is engaged in the business of buying, selling, and generally dealing in new and used **marine products** _____ and may, from time to time, obtain from Secured Party such sums of money as Secured Party, in its discretion, may advance to Dealer (or on behalf of Dealer) for the purchase of Inventory and which advances are to be secured by the security interests granted by this Agreement.

3    SECURITY INTEREST AND COLLATERAL - To secure repayment by Dealer of all Obligations (as defined below), Dealer hereby grants to Secured Party a continuing security interest in the following property of Dealer (hereinafter collectively called the "Collateral").

( A ) All of the Dealer's presently owned and hereafter acquired Inventory, wherever located, and the Proceeds thereof. The term "Inventory" means **All of the Debtor's inventory, equipment, accounts, contract rights (including but not limited to any purchase and rental agreements), chattel paper, documents and general intangibles, of whatever kind or nature, wherever located, now owned or hereafter acquired, and all returns, repossessions, substitutions, replacements, parts, additions and accessions, thereto and thereof, and all proceeds (including but not limited to cash, instruments, chattel paper, general intangibles and accounts) and products thereof.**

( B ) All monies and credits, owing or to become owing at any time to Dealer from any manufacturer and/or distributor selling Inventory to Dealer. Such monies and credits shall include, but not be limited to: rebates, factory credits, volume incentives, advertising credits and price protection becoming payable at any time to Dealer from manufacturers and/or distributors.

The term "Proceeds" as used above and elsewhere in this Agreement shall mean all cash and non-cash proceeds received by Dealer or on its behalf upon the sale or lease of Inventory or otherwise in connection with the Inventory. Non-cash proceeds shall include, without limitation, all accounts, contract rights, chattel paper, leases, rental contracts and instruments (as those terms are defined in the Uniform Commercial Code to the extent defined therein) and any amounts payable pursuant to policies of insurance covering Inventory.

The term "Dealer Receivables" as used herein shall mean and include the monies and credits in which Secured Party is granted a security interest pursuant to (B) above.

The term "Obligations" as used in this Agreement shall mean and include the following:

( i )         All indebtedness owing or to become owing for advances made by Secured Party to Dealer from time to time under this Agreement.

( ii )        Any other liabilities and obligations of Dealer, whether monetary or otherwise, now existing or hereafter arising in favor of Secured Party, including any attorney's fees and expenses to which Secured Party may be entitled as further provided in this Agreement.

4.    DEALER'S REPRESENTATIONS AND AGREEMENTS -
( A ) Dealer represents that its principal place of business and chief executive office is located at its address shown below:

| 1455 W. Morena Blvd. | San Diego | | CA | 92110 |
|---|---|---|---|---|
| Street Address | City | County | State | Zip . |

( B ) Dealer will execute and deliver to Secured Party all financing statements requested by Secured Party and will pay all costs of filing the same; and authorizes Secured Party to sign financing statements for Dealer. A copy of this Agreement or any financing statement may be filed as a financing statement. Dealer will maintain a first priority security interest in favor of Secured Party in the Collateral, subject only to other liens acceptable to Secured Party in its discretion.

( C ) Dealer will, upon the purchase of each new or used item of Inventory, at the request of Secured Party, deliver the Certificate of Title or Certificate of Origin, if any, issuable for such item to Secured Party, and Secured Party shall have the right to have its security interest noted thereon and to retain in its possession such Certificate of Title or Certificate of Origin.

( D ) Dealer shall keep complete and accurate records of its business, which shall be available for Secured Party's inspection at all reasonable times, and will furnish to Secured Party such information regarding its business and financial condition as may be requested; Secured Party may enter the premises of Dealer to perform reasonable Inventory inspections, at Dealer's expense.

( E ) Dealer agrees that Secured Party may, at all times, use and apply any or all Dealer Receivables toward the payment of Obligations which are due and unpaid, in whole or in part; that Secured Party may notify and direct the parties owing the same to make payment thereof to Secured Party for application to the payment of due and unpaid Obligations, without prior notification to Dealer.

( F ) Dealer will not sell, consign, transfer or otherwise deliver any Collateral or interest therein to any person, other than in Dealer's ordinary course of business.

( G ) Dealer will keep the Collateral in good order and repair and will pay all taxes, assessments or charges which may be levied or assessed against the same, and in the event of its failure to comply with the foregoing, Secured Party may expend such amounts as it, in its sole discretion may deem to be necessary to repair or put the Collateral into operating condition or to pay any and all taxes, assessments, charges or encumbrances to be discharged, which amounts shall be considered Obligations.

( H ) Dealer will keep the Collateral insured for full value against all insurable risks, with loss payable to Secured Party as its interest may appear under the policies which are subject to cancellation upon no less than thirty (30) days written notice to Secured Party. Should Dealer fail to procure such insurance, Secured Party may procure the same and the cost thereof shall be considered an Obligation.

( I ) Dealer will pay all indebtedness arising from advances by Secured Party on Dealer's behalf for the purchase of Inventory; indebtedness shall include the principal amount of such advances, plus charges as agreed to between the parties from time to time, in accordance with the following:

( i )         Secured Party shall from time to time announce charges which Dealer may accept or reject.

( ii )        Any statements of account furnished by Secured Party to Dealer shall be conclusively presumed to be evidence of such prior agreement, unless objected to within ten (10) days after receipt thereof by Dealer.

( iii )  If, for any reason the charge or any portion thereof included in any statement of account furnished to Dealer shall be unenforceable, Dealer shall be deemed to have, at all times, agreed to charges of no less than fifteen 15% per annum (but not greater than the maximum contract rate under applicable law).

All Obligations are payable by Dealer when due as indicated on any statements submitted to Dealer, and in any event upon the sale or other disposition by Dealer of any item of Inventory (unless otherwise agreed to by Secured Party). Any failure by Dealer to pay any indebtedness represented by any item of Inventory sold or otherwise disposed of by Dealer shall have the immediate effect of accelerating all Obligation then outstanding, whether or not then due and payable. Dealer agrees to pay reasonable attorney's fees as allowed by law, together with any costs incurred by Secured Party in the collection of any Obligations or the enforcement of Secured Party's remedies as provided herein. Secured Party may apply or reapply monies received in payment of Obligations, in such order of application as Secured Party may determine. In No event shall Dealer be obligated to pay any amount hereunder in excess of the maximum amount of interest permitted under applicable law.

( J ) All floor plan checks, field examinations and other inspections by the Secured Party are for the benefit of Secured Party only and not to be relied on by Dealer or any third persons.

5    DEFAULT - Any of the following shall constitute a Default under this Agreement
   ( A )  Any breach or failure by Dealer to pay or perform any Obligations or any of its and undertakings hereunder or under any other agreement between the parties
   ( B )  Any material misrepresentation by Dealer in connection with the information concerning Dealer's business and financial condition supplied to Secured Party
   ( C )  Dealer's becoming insolvent, or making an assignment for the benefit of creditors, the filing of a petition in bankruptcy by or against the Dealer, the commencement of proceedings for the appointment of a receiver for Dealer or any of its property, or the commencement of proceedings for reorganization, composition or liquidation under any federal or state insolvency law
   ( D )  A levy upon any of the Collateral, or a revocation or repudiation of any Obligations
   ( E )  Any change in Dealer's or any guarantor's financial condition, assets or prospects that Secured Party deems adverse, or the occurrence of any other circumstance or event as a result of which Secured party deems itself insecure

6    REMEDIES - In the event of any Default, Secured Party shall have all of the rights and remedies of a secured party as provided in the Uniform Commercial Code and, in addition, the right to do any or all of the following
   ( A )  Declare any or all unpaid Obligations immediately due and payable, and cancel any committed but unfunded advances
   ( B )  Take possession of all or any of the Collateral then in the possession of Dealer, or wherever found, and for that purpose Secured Party may enter the premises of Dealer, who agrees to assemble and deliver the Collateral at a place reasonably convenient to Secured Party
   ( C )  Deduct from the proceeds of sale of Collateral any unpaid Obligations, any attorney's fees, whether incurred through judicial proceedings or otherwise, court costs incurred by Secured Party, other expenses such as moving, storage and repair of the Collateral, and any expenses incurred for the preservation or renovation of the Collateral for purposes of sale

7    HAZARDOUS WASTE INDEMNIFICATION - Dealer shall indemnify and hold harmless Secured Party, its parent company, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns from and against any loss, damage, cost, expense or liability directly or indirectly arising out of or attributable to the use, generation, manufacture, treatment, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance on, under or about Dealer's property or operations or property leased to Dealer, including but not limited to attorney's fees (including the reasonable estimate of the allocated cost of in-house counsel and staff)  For these purposes, the term "hazardous substances" means any substance which is or becomes designated as "hazardous" or "toxic" under any federal, state, or local law  This indemnity shall survive repayment of Dealer's obligations to Secured Party

8    GENERAL -
   ( A )  It is understood and agreed, any law, custom or usage to the contrary, that Secured Party shall have the right at all times to enforce the covenants and provisions of this Agreement in strict accordance with the terms hereof, notwithstanding any conduct or practice on the part of Secured Party in refraining from so doing at any time or times, further that the failure of Secured Party at any time or times to enforce its rights under this Agreement strictly in accordance with the same, shall not result in an alteration or waiver of any of the specific terms and provisions of this Agreement, or be construed as having modified the same.
   ( B )  Dealer and Secured Party hereby waive any and all right to trial by jury in any action brought to enforce this Agreement or any amendment thereto or any related matters  To the fullest extent permitted by law, Dealer waives relief from any appraisement, valuation, anti-deficiency, homestead, exemption or usury laws now or hereafter in effect
   ( C )  This Agreement may not be modified, altered or amended except by a further agreement in writing signed by the parties hereto  Any provision of the Agreement found upon judicial interpretation or construction to be void or prohibited by law shall not invalidate the remaining provisions hereof
   ( D )  Dealer hereby irrevocably appoints Secured Party, including any of its employees as it may designate, as its true and lawful attorney-in-fact, with power of substitution, to do the following in its place and stead  to execute and deliver in the name of Dealer, financing statements, lien filings and Certificates of Title relating to Collateral, to make, execute and deliver in the name of Dealer as maker any promissory note(s) evidencing the Obligations or other amounts due Secured Party, to endorse Dealer's name upon any notes, checks, drafts, money orders and other forms of instruments made payable to Dealer and relating to Collateral, and generally to do and perform all acts and all things necessary to discharge the power hereby granted, which shall specifically include the making of any acknowledgments and affidavits necessary for the filing or recording of any or all of the foregoing  The foregoing powers are coupled with an interest and shall be considered irrevocable without prior written consent of Secured Party for such time as any Obligations may remain outstanding
   ( E )  Secured Party may assign the benefits of this Security Agreement to a third party, whereupon Secured Party's assignee shall be entitled thereto  and Dealer shall thereupon be obligated to Secured Party's assignee for the payment of Obligations and the performance of all other obligations for which it is bound hereunder
   ( F )  This Agreement will be governed by the laws of the state in which Secured Party maintains its principal place of business  the state and federal courts of such state will have jurisdiction to determine any claim or dispute pertaining to this Agreement and related matters
   ( G )  **This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten agreements between the parties.**

   IN WITNESS WHEREOF, this Agreement has been duly executed by and on behalf of the undersigned this _____ day of

__July_____  19 97

                                        Apollo Fisheries Service, Inc. dba Blue Porpoise Marine
                                        _____
                                                        (Dealer)

                                        By _____

                                        Its _President_____

Accepted

NationsCredit Commercial Corporation of America
_____
                (Secured Party)

By _____
                (Its Authorized Agent)

                            CERTIFICATE

   This is to certify that a meeting of the Board of Directors of _Apollo Fisheries Service, Inc._____, which meeting was duly called and properly held on _7 - 21 - 97____ pursuant to its by-laws, and at which meeting a quorum was present throughout, the following resolution was unanimously adopted

   RESOLVED  that the form of Security Agreement-Inventory presented in this meeting and attached hereto, is hereby approved, and the appropriate officers of this corporation are hereby authorized to execute and deliver the same for and on behalf of this corporation to _NationsCredit Commercial Corporaiton of America_____ (who shall be entitled to absolutely rely upon the authority of such officers)

(CORPORATE SEAL)                                        _____
                                                                        Secretary

**Guaranty**                                                                          (ANY AND ALL LOCATIONS)

| Obligee (Finance Co.): NationsCredit Commercial Corporation of America | Debtor: Apollo Fisheries Service, Inc. d/b/a Blue Porpoise Marine |
|---|---|
| Address: 1000 Holcomb Woods PKWY   STE 240   PO Box 103038 | Address: 1455 W. Morena Blvd. |
| City: Roswell   State GA   Zip 30076 | City: San Diego   State CA   Zip 92110 |

To induce you to extend credit to the Debtor named above (hereinafter "Debtor"), and in consideration of the benefits to accrue to each of us, the undersigned (hereinafter "Guarantors"), jointly and severally unconditionally guarantee and promise to pay you on demand any and all indebtedness of Debtor as may be owing to you. The word "indebtedness" includes any and all advances, loans or other financial accommodations heretofore or hereafter granted by you to, or for the account of, Debtor. Each of Guarantor also guarantees the due performance by Debtor of all its obligations under any present or future agreement with you. The words "you" and "your" as used herein shall mean and include you and your subsidiaries and affiliates.

This is a continuing Guaranty covering all present and future indebtedness of Debtor to you and shall include indebtedness revived after being satisfied. This Guaranty shall not apply to any indebtedness created after actual receipt by you of written notice of its revocation as to future transactions, but revocation by any Guarantor shall not affect the continuing liability of any other Guarantor(s) that do not give notice of termination. If claim is ever made upon you for repayment or recovery of any amount or amounts received by you in payment of any obligations of Debtor to you and you repay all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body, or (b) any settlement or compromise of any such claim effected by you with any such claimant (including Debtor), then in such event the Guarantors agree that any such judgment, decree, order, settlement or compromise shall be binding upon them, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any of such obligations, and the Guarantors shall be and remain obligated to you hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by you. The obligation of each Guarantor hereunder is joint and several, notwithstanding that the Guarantors signing this Guaranty may be both individuals and partnerships or corporations.

All indebtedness of Debtor shall, for the purposes hereof, be deemed immediately due and payable without notice or demand, and shall be forthwith payable by Guarantors on demand in the event that: Debtor shall fail to pay any indebtedness when due or commit any breach or default in the performance of Debtor's undertakings and obligations contained in any agreement with you; Debtor becomes unable to pay its debts as they mature, makes an assignment for the benefit of creditors or takes advantage of the insolvency laws of any state; or if a petition under any chapter of the Bankruptcy Code or for the appointment of a receiver of any part of the property of the Debtor is filed by or against the Debtor.

Guarantors agree: that you may, without notice or demand, from time to time renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the indebtedness or any part thereof, take and hold security for the payment of this Guaranty or the indebtedness hereby guaranteed, and exchange, enforce, waive and release any such security, apply such security and direct the order or manner of sale thereof as you in your discretion may determine, and release or substitute any one or more endorsers or Guarantors; that you shall not be required to proceed against Debtor, proceed against or exhaust any security held from Debtor, or pursue any other remedy against Debtor in your power before proceeding against Guarantors; that Guarantors shall have neither any right of subrogation, contribution, indemnity, or reimbursement for payments Guarantors may be required to make hereunder, nor any right to participate in any security now or hereafter held by you; that all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty and of the existence, creation, or incurring of new or additional indebtedness are hereby waived; that their obligation hereunder shall not be discharged, impaired or affected by: the power or authority or lack thereof of Debtor to incur the indebtedness, the validity or invalidity of the documents evidencing the indebtedness, any offsets, counterclaims or defenses (other than payment in full of the indebtedness and the performance of all Debtor's obligations) that Guarantors may or might have to their respective undertakings liabilities and obligations hereunder, all of which are hereby waived by Guarantors; that any indebtedness of Debtor now or hereafter held by Guarantors is hereby subordinated to the indebtedness of Debtor to you, and such indebtedness of Debtor to Guarantors if you so request, shall be collected, enforced and received by Guarantors as your trustee and be paid over to you on account of the indebtedness of Debtor to you but without reducing or affecting in any manner the liability of Guarantors under the other provisions of this Guaranty; and that they shall pay a reasonable attorney's fee and all other costs and expenses which may be incurred by you in the enforcement of this Guaranty or in defense of any claims raised by way of counterclaim, defense, or set-off in enforcement of this Guaranty; if only one person or entity signs this Guaranty, then all words used herein in the plural in reference to Guarantors shall be deemed to have been used in the singular where the context and construction so require; Guarantors agree that trial by jury in any suit, action or proceeding arising on, out of, under or by reason of or relating in any way to this Guaranty or any transaction hereunder, or concerning the validity, interpretation or enforcement of this Guaranty as between any or all of the Guarantors and you is hereby waived.

This Guaranty and all rights, obligations and liabilities arising hereunder shall be construed according to the laws of the Commonwealth of Pennsylvania. Guarantors agree that the courts of the State of Pennsylvania, including the United States District Court for the Eastern District of Pennsylvania, shall have jurisdiction to hear and determine any claim, dispute or demand pertaining to this Guaranty and involving any or all of the Guarantors. Guarantors expressly submit and consent to such jurisdiction, hereby waiving personal service of any Summons and Complaint or other process to be issued in any action or proceeding based upon any such claim, dispute or demand, and hereby agree that service of such Summons and Complaint or other process, may be made by registered or certified mail to Guarantors at the address appearing herein. Should the party(ies) so served fail to appear or answer any Summons, Complaint or process so served, within Thirty (30) days after the mailing thereof, such party(ies) shall be deemed in default and you shall be entitled to enter a judgment or order as demanded or prayed for therein. Nothing herein shall affect your right to serve process in any other manner provided by law, or to commence legal proceedings or otherwise proceed against Guarantors in the state or federal courts of any other jurisdiction.

This Guaranty shall inure to the benefit of your transferees and assignees of any part or all of the indebtedness and shall extend to loans made by such transferees or assignees.

| If Individual or Partnership, Guarantor(s) Sign here | | |
|---|---|---|
| Witness *Celia Ybarra* | Signature *M. Curtis Sledrick* | Date 7-29-97 |
| Witness *James E. Dye* | Address 4413 Canto St | |
| | City San Diego   State Ca.   Zip 92007 | |
| Witness | Signature | Date |
| Witness | Address | |
| | City   State   Zip | |

| If Guarantor is a Corporation, Sign Here and Complete Certificate | | |
|---|---|---|
| | Corporation | |
| | Address | |
| | City   State   Zip | |
| Attest | Signature   Title   Date | |

**NATIONSCREDIT**

## Landlord Waiver

1. For good and valuable considerations, the receipt and sufficiency of which are acknowledged by the undersigned, who represents that he is the landlord of the premises known as:

Site: *Blue Porpose Marine*

Address: *1955 W. Morena Blvd*

City: *San Diego*   State: *Ca.*   Zip: *92110*

Tenant: *Apollo Fisheries Svc., dba. Blue Porpoise Marine*

The landlord, intending to be legally bound, waives all present and future rights to levy, distrain or seize for rent or other obligations of the tenant, the following goods which have been or are to be delivered to the premises and which have been or are subjected to a security interest in favor of NationsCredit Commercial Corporation (NCCC):

List goods

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
All of Debtor's inventory, equipment, accounts, contract rights, chattel paper, documents, securities and other investment property, general intangibles, and other assets and property of whatever kind or nature, wherever located, now owned or hereafter acquired, and all proceeds and products of the foregoing.

2. Landlord acknowledges the validity of any security interest NCCC may now have or later have in the goods and that NCCC's security interest shall always be superior to the landlord's rights.

3. NCCC may remove, at any time, all or any part of the goods from the premises and landlord will not interfere with NCCC's removal or make any claims to the goods.

4. NCCC may waive any and all of the terms of the security agreement by which it holds a security interest in the goods without the consent of the landlord and without giving notice to the landlord. This instrument will not be changed by any indulgence or waiver NCCC may grant under the security agreement.

5. Landlord's duty under this instrument shall run with the land and bind all successors to the landlord's interest.

Signature of Landlord

Date *7/30/97*

# Guaranty
(ANY AND ALL LOCATIONS)

Obligee (Finance Co.): NationsCredit Commercial Corporation of America   Debtor: Apollo Fisheries Service, Inc. d/b/a Blue Porpoise Marine

Address: 1000 Holcomb Woods PKWY  STE 240  PO Box 103038    Address: 1455 W. Morena Blvd.

City: Roswell   State: GA   Zip: 30076    City: San Diego   State: CA   Zip: 92110

To induce you to extend credit to the Debtor named above (hereinafter "Debtor"), and in consideration of the benefits to accrue to each of us, the undersigned (hereinafter "Guarantors"), jointly and severally unconditionally guarantee and promise to pay you on demand any and all indebtedness of Debtor as may be owing to you. The word "indebtedness" includes any and all advances, loans or other financial accommodations heretofore or hereafter granted by you to, or for the account of, Debtor. Each of Guarantor also guarantees the due performance by Debtor of all its obligations under any present or future agreement with you. The words "you" and "your" as used herein shall mean and include you and your subsidiaries and affiliates.

This is a continuing Guaranty covering all present and future indebtedness of Debtor to you and shall include indebtedness revived after being satisfied. This Guaranty shall not apply to any indebtedness created after actual receipt by you of written notice of its revocation as to future transactions, but revocation by any Guarantor shall not affect the continuing liability of any other Guarantor(s) that do not give notice of termination. If claim is ever made upon you for repayment or recovery of any amount or amounts received by you in payment of any obligations of Debtor to you and you repay all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body, or (b) any settlement or compromise of any such claim effected by you with any such claimant (including Debtor), then in such event the Guarantors agree that any such judgment, decree, order, settlement or compromise shall be binding upon them, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any of such obligations, and the Guarantors shall be and remain obligated to you hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by you. The obligation of each Guarantor hereunder is joint and several, notwithstanding that the Guarantors signing this Guaranty may be both individuals and partnerships or corporations.

All indebtedness of Debtor shall, for the purposes hereof, be deemed immediately due and payable without notice or demand, and shall be forthwith payable by Guarantors on demand in the event that: Debtor shall fail to pay any indebtedness when due or commit any breach or default in the performance of Debtor's undertakings and obligations contained in any agreement with you; Debtor becomes unable to pay its debts as they mature, makes an assignment for the benefit of creditors or takes advantage of the insolvency laws of any state; or if a petition under any chapter of the Bankruptcy Code or for the appointment of a receiver of any part of the property of the Debtor is filed by or against the Debtor.

Guarantors agree: that you may, without notice or demand, from time to time renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the indebtedness or any part thereof, take and hold security for the payment of this Guaranty or the indebtedness hereby guaranteed, and exchange, enforce, waive and release any such security, apply such security and direct the order or manner of sale thereof as you in your discretion may determine, and release or substitute any one or more endorsers or Guarantors; that you shall not be required to proceed against Debtor, proceed against or exhaust any security held from Debtor, or pursue any other remedy against Debtor in your power before proceeding against Guarantors; that Guarantors shall have neither any right of subrogation, contribution, indemnity, or reimbursement for payments Guarantors may be required to make hereunder, nor any right to participate in any security now or hereafter held by you; that all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty and of the existence, creation, or incurring of new or additional indebtedness are hereby waived; that their obligation hereunder shall not be discharged, impaired or affected by: the power or authority or lack thereof of Debtor to incur the indebtedness, the validity or invalidity of the documents evidencing the indebtedness, any offsets, counterclaims or defenses (other than payment in full of the indebtedness and the performance of all Debtor's obligations) that Guarantors may or might have to their respective undertakings liabilities and obligations hereunder, all of which are hereby waived by Guarantors; that any indebtedness of Debtor now or hereafter held by Guarantors is hereby subordinated to the indebtedness of Debtor to you, and such indebtedness of Debtor to Guarantors if you so request, shall be collected, enforced and received by Guarantors as your trustee and be paid over to you on account of the indebtedness of Debtor to you but without reducing or affecting in any manner the liability of Guarantors under the other provisions of this Guaranty; and that they shall pay a reasonable attorney's fee and all other costs and expenses which may be incurred by you in the enforcement of this Guaranty or in defense of any claims raised by way of counterclaim, defense, or set-off in enforcement of this Guaranty; if only one person or entity signs this Guaranty, then all words used herein in the plural in reference to Guarantors shall be deemed to have been used in the singular where the context and construction so require; Guarantors agree that trial by jury in any suit, action or proceeding arising on, out of, under or by reason of or relating in any way to this Guaranty or any transaction hereunder, or concerning the validity, interpretation or enforcement of this Guaranty as between any or all of the Guarantors and you is hereby waived.

This Guaranty and all rights, obligations and liabilities arising hereunder shall be construed according to the laws of the Commonwealth of Pennsylvania. Guarantors agree that the courts of the State of Pennsylvania, including the United States District Court for the Eastern District of Pennsylvania, shall have jurisdiction to hear and determine any claim, dispute or demand pertaining to this Guaranty and involving any or all of the Guarantors. Guarantors expressly submit and consent to such jurisdiction, hereby waiving personal service of any Summons and Complaint or other process to be issued in any action or proceeding based upon any such claim, dispute or demand, and hereby agree that service of such Summons and Complaint or other process, may be made by registered or certified mail to Guarantors at the address appearing herein. Should the party(ies) so served fail to appear or answer any Summons, Complaint or process so served, within Thirty (30) days after the mailing thereof, such party(ies) shall be deemed in default and you shall be entitled to enter a judgment or order as demanded or prayed for therein. Nothing herein shall affect your right to serve process in any other manner provided by law, or to commence legal proceedings or otherwise proceed against Guarantors in the state or federal courts of any other jurisdiction.

This Guaranty shall inure to the benefit of your transferees and assignees of any part or all of the indebtedness and shall extend to loans made by such transferees or assignees.

| If Individual or Partnership, Guarantor(s) Sign here | | | |
|---|---|---|---|
| Witness | Signature | | Date 7-22-97 |
| Witness | Address 4413 Cosito St. | | |
| | City San Diego | State Ca | Zip 92110 |
| Witness | Signature | | Date 7/25/97 |
| Witness | Address 4413 (Sista St. | | |
| | City San Diego | State CA | Zip 92107 |

| If Guarantor is a Corporation, Sign Here and Complete Certificate | | | |
|---|---|---|---|
| | Corporation | | |
| | Address | | |
| | City | State | Zip |
| Attest | Signature | Title | Date |
| | As Corporate Secretary, I do hereby certify that the fore... | | "Resolved: That any officer of the corporation be and... |

**EXHIBIT 3**

This STATEMENT is presented for filing pursuant to the California Uniform Commercial Code

| 1. FILE NO. OF ORIG. FINANCING STATEMENT | 1A. DATE OF FILING OF ORIG. FINANCING STATEMENT | 1B. DATE OF ORIG. FINANCING STATEMENT | 1C. PLACE OF FILING OF FINANCING STATEMENT |
|---|---|---|---|
| 9723860455 | 8/22/97 | | CALIFORNIA |

| 2. DEBTOR (LAST NAME FIRST) | 2A. SOCIAL SECURITY NO., FEDERAL TAX NO |
|---|---|
| Apollo Fisheries Service, Inc. | 95-2922806 |

| 2B. MAILING ADDRESS | 2C. CITY, STATE | 2D. ZIP CODE |
|---|---|---|
| 1455 W. Morena Blvd. | San Diego, CA | 92110 |

| 3. ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST) | 3A. SOCIAL SECURITY OR FEDERAL TAX NO |
|---|---|
| DBA Blue Porpoise Marine | |

| 3B. MAILING ADDRESS | 3C. CITY, STATE | 3D. ZIP CODE |
|---|---|---|
| 1455 W. Morena Blvd. | San Diego, CA | 92110 |

| 4. SECURED PARTY | | 4A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO. |
|---|---|---|
| NAME | NationsCredit Commercial Corporation of America | |
| MAILING ADDRESS | 1000 Holcomb Woods Pkwy., Ste. 240 P.O. Box 103038 | |
| CITY | Roswell | STATE GA | ZIP CODE 30076 |

| 5. ASSIGNEE OF SECURED PARTY (IF ANY ) | | 5A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO. |
|---|---|---|
| NAME | | |
| MAILING ADDRESS | | |
| CITY | STATE | ZIP CODE |

6.
A. ☐ **CONTINUATION-** The original Financing Statement between the foregoing Debtor and Secured Party bearing the file number and date shown above is continued. If collateral is crops or timber, check here ☐ and insert description of real property on which growing or to be grown in Item 7 below.

B. ☐ **RELEASE-** From the collateral described in the Financing Statement bearing the file number shown above, the Secured Party releases the collateral described in Item 7 below.

C. ☐ **ASSIGNMENT-** The Secured Party certifies that the Secured Party has assigned to the Assignee above named, the Secured Party's rights under the Financing Statement bearing the file number shown above in the collateral described in Item 7 below.

D. ☐ **TERMINATION-** The Secured Party certifies that the Secured Party no longer claims a security interest under Financing Statement bearing the file number shown above.

E. ☒ **AMENDMENT-** The Financing Statement bearing the file number shown above is amended as set forth in Item 7 below. (Signature of Debtor required on all amendments.)

F. ☐ **OTHER** Amendment

7. please amend the secured party address in block 4 to read as follows:
NationsCredit Distribution Finance, Inc.
GA7-903-01-09
1355 Windward Concourse
Alpharetta, GA 30005
FEID# 56-1796724

| 8. | | | 9. This Space Use of Filing Officer |
|---|---|---|---|
| | (DATE) 3-9 19 99 | C O D E | **99081C0452** |
| Apollo Fisheries Service, Inc. | | 1 | |
| By: *Attorney-in-Fact, L Stephens* | | 2 | |
| SIGNATURE(S) OF DEBTOR(S) (TITLE) | | | |
| NationsCredit Commercial Corporation | | 3 | |
| By: *Lisa Stephens*   *Documentation Spec* | | 4 | |
| SIGNATURE(S) OF SECURED PARTY(IES) (TITLE) | | 5 | |

| 10. | | | 6 |
|---|---|---|---|
| NAME ADDRESS CITY AND STATE | **Return Copy to** Data File Services, Inc. P.O. Box 275 Van Nuys CA 91408-2750 | Phone 800-331-3282 Fax 818-909-4717 | 7 |
| | | | 8 |
| | | | 9 |

FILED
SACRAMENTO, CA
MAR 11, 1999 AT 0800
BILL JONES
SECRETARY OF STATE

Uniform Commercial Code — Form UCC-2

(2) FILING OFFICER COPY - ACKNOWLEDGEMENT    Prepared with UCC Direct for Windows  Data File Services, Inc., P.O. Box 275, Van Nuys, CA., 91408-0275 Tel (818) 909-2200

This FINANCING STATEMENT is presented for filing pursuant to the California Uniform Commercial Code.

| 1. DEBTOR   (LAST NAME FIRST—IF AN INDIVIDUAL) | | 1A. SOCIAL SECURITY OR FEDERAL TAX NO. |
|---|---|---|
| Apollo Fisheries Service, Inc. | | 95-2922806 |

| 1B. MAILING ADDRESS | 1C. CITY, STATE | 1D. ZIP CODE |
|---|---|---|
| 1455 W. Morena Blvd. | San Diego, CA | 92110 |

| 2. ADDITIONAL DEBTOR   (IF ANY)   (LAST NAME FIRST—IF AN INDIVIDUAL) | | 2A. SOCIAL SECURITY OR FEDERAL TAX NO. |
|---|---|---|
| dba Blue Porpoise Marine | | 95-2922806 |

| 2B. MAILING ADDRESS | 2C. CITY, STATE | 2D. ZIP CODE |
|---|---|---|
| 1455 W. Morena Blvd. | San Diego, CA | 92110 |

| 3. DEBTOR'S TRADE NAMES OR STYLES   (IF ANY) | 3A. FEDERAL TAX NUMBER |
|---|---|
| | |

| 4. SECURED PARTY | 4A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A B A NO. |
|---|---|
| NAME   NationsCredit Commercial Corporation of America<br>MAILING ADDRESS   1000 Holcomb Woods Parkway   Suite 240   P.O. Box 103038<br>CITY   Roswell   STATE   GA   ZIP CODE   30076 | |

| 5. ASSIGNEE OF SECURED PARTY   (IF ANY) | 5A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A B A NO. |
|---|---|
| NAME<br>MAILING ADDRESS<br>CITY   STATE   ZIP CODE | |

6. This FINANCING STATEMENT covers the following types or items of property (include description of real property on which located and owner of record when required by instruction 4).

All of the Debtor's inventory, equipment, accounts, contract rights (including but not limited to any purchase and rental agreements), chattel paper, documents and general intangibles, of whatever kind or nature, wherever located, now owned or hereafter acquired, and all returns, repossessions, substitutions, replacements, parts, additions and accessions, thereto and thereof, and all proceeds (including but not limited to cash, instruments, chattel paper, general intangibles and accounts) and products thereof.

| 7. CHECK IF APPLICABLE [X] | 7A. [ ] PRODUCTS OF COLLATERAL ARE ALSO COVERED | 7B. DEBTOR (S) SIGNATURE NOT REQUIRED IN ACCORDANCE WITH INSTRUCTION 5 (e) ITEM:  [ ] (1)  [ ] (2)  [ ] (3)  [ ] (4) |
|---|---|---|

| 8. CHECK IF APPLICABLE [X] | [ ] DEBTOR IS A "TRANSMITTING UTILITY" IN ACCORDANCE WITH UCC § 9105 (1) (n) |
|---|---|

9. Apollo Fisheries Service, Inc.
► dba Blue Porpoise Marine
SIGNATURE(S) OF DEBTOR(S)     DATE: 7-29-9

TYPE OR PRINT NAME(S) OF DEBTOR(S)     Natalie Cintas Gladnick

NationsCredit Commercial Corporation of America
►     Rachel Bailey
SIGNATURE(S) OF SECURED PARTY(IES)     Rachel Bailey

TYPE OR PRINT NAME(S) OF SECURED PARTY(IES)

11. Return copy to:
NAME     NationsCredit Commercial Corporation of America
ADDRESS     P.O. Box 103038
CITY     Roswell, GA 30076
STATE
ZIP CODE

Filing Officer is requested to note file number, date and hour of filing on this copy and return to the above party.

(2) FILING OFFICER COPY—ACKNOWLEDGMENT

FORM UCC-1—FILING FEE $3.00
Approved by the Secretary of State

10. THIS SPACE FOR USE OF FILING OFFICER (DATE, TIME, FILE NUMBER AND FILING OFFICER)

9723860455

FILED
SACRAMENTO, CA
AUG  22, 1997 AT 0800

BILL JONES
SECRETARY OF STATE

## SECURITY AGREEMENT AND DISCLOSURE STATEMENT
### (Simple Interest)

DATE May 1, 2000

SELLER: Blue Porpoise Marine

BUYER(S): Jerry & Joellen Saltine

ADDRESS: 1455 W. Morena Blvd SD CA 92110
(Street) (City) (State) (Zip)

ADDRESS: 901 Summer Holly Lane Encintas CA 92024
(Street) (City) (State) (Zip)

AGREEMENT: Buyers agree that it was their decision to purchase the goods and/or services described below at the Total Sale Price rather than paying cash for the goods and/or services at the Cash Price, which is less. In return for Seller financing for Buyers the purchase of the goods and/or services described below, Buyers each individually and together promise and agree as follows:

5980100001 8943

| Complete Description of the Goods and Work to be Done | Cash Price (Including Tax) |
|---|---|
| New 1999 Albemarle /320 Expres XWR3211RE899 | 182000.00 |
| 1999 Caterpillar Twin YB3116TA Desel | |

**SECURITY INTEREST:** Buyers hereby grant to Seller a security interest in the goods described above, and proceeds from the goods, including insurance proceeds, to secure payment of all amounts due and performance of the other terms of this agreement.

| ANNUAL PERCENTAGE RATE The cost of Buyers' credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost Buyers. | Amount Financed The amount of credit provided to Buyers or on Buyers' behalf. | Total of Payments The amount Buyers will have paid after Buyers have made all payments as scheduled. | Total Sale Price The total cost of Buyers' purchase on credit, including Buyers' downpayment of $ 18000.00 |
|---|---|---|---|---|
| 8.5 % | $ 178710.20 | $ 165049.00 | $ 343759.20 | $ 361759.20 |

**Buyers' payment schedule will be:**

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 240 | $1432.33 | May 31, 2000 |
| | $ | Monthly Starting |

**Security:** Buyers are giving a security interest in the goods or property being purchased.

**Late Charge:** If any part of a payment is late, Buyers will be charged $10.00

**Prepayment:** If Buyers pay off early, Buyers will not have to pay a penalty.

See the contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties, and security interests.

### ITEMIZATION OF THE AMOUNT FINANCED

*Some part of these charges may be paid to or retained by the Seller.

| | | |
|---|---|---|
| Cash price excluding taxes | $ 182549.00 | (1) |
| Sales tax | $ N/A | (2) |
| Cash price plus taxes (1+2) | $ 182549.00 | (3) |
| To public officials for filing fees | $ 500.00 | (4) |
| To insurance company for credit life insurance | *$ N/A | (5) |
| To insurance company for credit disability insurance | *$ N/A | (6) |
| To insurance company for property insurance | *$ N/A | (7) |
| Total insurance (5+6+7) | $ N/A | (8) |
| Cost of service contract paid to provider named below | *$ N/A | (9) |
| To _____ for _____ | *$ N/A | (10) |
| Total of above (3+4+8+9+10) | $ 183049.00 | (11) |
| Trade-in (description) _____ | $ N/A (12) | |
| Cash downpayment | $ 18000.00 (13) | |
| Total downpayment (12+13) | $ 18000.00 | (14) |
| Amount financed (11 minus 14) | $ 165049.00 | |

**Insurance (Optional):** Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless a Buyer signs and agrees to pay the additional cost, which will be included in the Amount Financed. If a Buyer signs, this insurance will be procured by the Seller.

| Type | Premium | Term (Months) | Signature |
|---|---|---|---|
| Credit Life | ☐ Single Coverage $ N/A<br>☐ Joint Coverage $ N/A | | I want credit life insurance. N/A ___ Signature ___ Date |
| Credit Disability | $ | | I want credit disability insurance. N/A ___ Signature ___ Date |

CREDIT LIFE AND DISABILITY INSURANCE: If Buyers elect credit insurance coverage and are accepted by the insurance company, the terms and conditions will be as described in the NOTICE OF PROPOSED GROUP INSURANCE, or in the policies or certificates issued by the insurance company. The original amount of the decreasing term credit life insurance will not exceed $ _____ . Credit disability insurance payments will equal the monthly payment amount but will not be more than $ _____ . Insurance Company:

Cash downpayment ........................................................................... $ _____ (13)

Total downpayment ........................................................................... $ _____ (14)

Amount financed (11 minus 14) ........................................................ $ _____

**Insurance (Optional):** Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless a Buyer signs and agrees to pay the additional cost, which will be included in the Amount Financed. If a Buyer signs, this insurance will be procured by the Seller.

| Type | Premium | Term (Months) | Signature | | |
|------|---------|---------------|-----------|---|---|
| Credit Life | ☐ Single Coverage $ <br> ☐ Joint Coverage $ | | I want credit life insurance. | Signature | Date |
| Credit Disability | $ | | I want credit disability insurance. | Signature | Date |

**CREDIT LIFE AND DISABILITY INSURANCE:** If Buyers elect credit insurance coverage and are accepted by the insurance company, the terms will be as described in the NOTICE OF PROPOSED GROUP INSURANCE, or in the policies or certificates issued by the insurance company. The original amount of the decreasing term credit life insurance will not exceed $ _____ . Credit disability insurance payments will equal the monthly payment amount but will not be more than $ _____ . Insurance Company: _____
**LIFE AND DISABILITY INSURANCE MAY NOT COVER THE ENTIRE AMOUNT DUE UNDER THIS AGREEMENT. BUYERS MUST SEE THEIR POLICY OR CERTIFICATE FOR EXACT COVERAGE.**

**PROPERTY INSURANCE:** Buyers agree to keep the goods described above insured to Seller's satisfaction. If property insurance must be obtained at the time this agreement is signed, Buyers may purchase it through any insurance company or agent of their choice. If Buyers fail to keep the goods satisfactorily insured during the term of this agreement, Buyers hereby authorize Seller, at Seller's option, to purchase any required insurance. Seller may either request immediate reimbursement from Buyers for the cost of such insurance or may add the insurance premium to the unpaid balance of this agreement. If the insurance premium is added to the unpaid balance of this agreement, interest will be charged on the insurance premium at the Annual Percentage Rate disclosed in this agreement, and Buyers agree to pay the insurance premium with interest in equal installments along with the payments shown on the payment schedule.

Buyers understand and agree that if Seller or its assignee purchases any property insurance, Seller will be acting in its own interest and will not be representing the Buyers' interests. Buyers further understand and agree that the purchased insurance will not contain any liability coverages, may cover only the Seller's interest in the property, may have deductible amounts different than those in any Buyer provided insurance, and may be more expensive than equivalent insurance which Buyers could purchase through their own sources. Buyers agree that Seller can purchase such insurance with coverage that will be retroactive to the date Buyers' insurance terminated. Buyers understand and agree that Seller may receive compensation or reimbursement in connection with such insurance.
**Any property insurance available through Seller does not include liability insurance of any kind.**

Unless a charge is shown for property insurance, none is sold under this agreement. Property insurance is available through Seller at a cost of $ _____ for a term of _____ months.   Insurance Company: _____

A Service Contract is not required. This is an option which costs the amount indicated below. The Service Contract is more fully described in the contract or certificate describing it. Please read those documents before signing this contract. If you elect this option by signing below, its cost is included in the Amount Financed under this Agreement.

Service Contract: $ _____ Deductible _____ Term: _____ mos.   Cost: $ _____

Coverage Provider _____

**Purchaser(s) want a Service Contract.**

Purchaser _____

**RECEIPT OF GOODS AND PROMISE TO PAY:** Buyers agree that they have received the goods and/or services described above, and have accepted delivery of the goods in good condition. Buyers promise to pay to the Seller at its address shown above the Amount Financed plus interest at the Annual Percentage Rate until paid in full in consecutive monthly installments as indicated above. Payments hereon shall be applied in the following order: first to monthly insurance premiums (if any), next to the finance charge accrued through actual payment date, next to the amount financed necessary to bring the account up to date, next to late charges (if any), next to the amount advanced for insurance (if any), next to returned check charges (if any), and then to the amount financed. Buyers understand that the finance charge will accrue each day that Buyers' amount financed is outstanding. Buyers further understand that the disclosures set forth above are based on the assumption that Buyers make all payments when due and in the amount due. If Buyers pay early, the finance charge will be less than the amount shown above. If Buyers pay late, the finance charge will be more than the amount shown above. If Buyers pay early, however, Buyers must continue to make payments in the amount shown above on the scheduled due date. Any amount financed unpaid after the final due date will accrue finance charge at the Annual Percentage Rate until paid in full.

**CHARGE FOR LATE PAYMENT:** If any part of any payment is more than 10 days late, Buyers agree to pay a late charge of $10.00.

**CHARGE FOR DISHONORED CHECKS:** In the event payment is made by a check which is dishonored, Buyers agree to pay to Seller a fee of $15.00.

**FAILURE TO COMPLY WITH THE TERMS OF AGREEMENT:** Buyers agree that if they fail to comply with any of the terms of this agreement, Seller, subject to any right that the Buyers may have to cure a default, may require Buyers to immediately pay the entire unpaid balance of this agreement, including but not limited to the unpaid amount financed and accrued and unpaid finance charge to date of payment.

**PAYMENT OF AGREEMENT AHEAD OF SCHEDULE:** Buyers understand that they may pay the outstanding agreement balance, which is the remaining balance of Amount Financed, plus accrued and unpaid Finance Charge to date of prepayment, at any time.

**NOTICE TO THE BUYER: 1. Do not sign this agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of this agreement. 3. You can prepay the full amount due under this agreement at any time. 4. If you desire to pay off in advance the full amount due, the amount which is outstanding will be furnished upon request. 5. Seller intends to sell this contract to a financial services company. Seller may share in a part of the finance charge you will pay.**

Buyers agree that at the time they signed they received a copy of this SECURITY AGREEMENT.

Accepted / _____   X _____ 5-1-00 (SEAL)
                                    Signature of Buyer

By _____ (SEAL)   X _____ 5-1-00 (SEAL)
   Signature and Title            Signature of Buyer

Person signing immediately below subjects his or her interests in the above described property to the terms of this security agreement, but does not promise personally to repay any debt secured by this agreement.

_____ (SEAL)

NOTICE: THE TERMS OF THIS AGREEMENT ARE CONTAINED ON BOTH SIDES OF THIS PAGE.

CALIFORNIA IB RIP-MARINE, FORM 005-3939  1/00
DISTRIBUTION: WHITE — BRANCH COPY; GREEN — FILE COPY; CANARY—SELLER COPY; PINK—2 BUYER'S COPIES

RULES FOR INTERPRETING THIS AGREEMENT: Paragraph headings are for convenient reference only and are not to be used as a complete summary of each paragraph. The word "Buyers" may mean one or more persons who are purchasing goods and/or services from the Seller and financing the purchase by this agreement. The word "Seller" includes any person or corporation to whom this agreement may be sold or assigned. Buyers agree that all of the terms of their agreement with Seller are contained in this written document. However, if this agreement is secured by a Ship's Preferred Mortgage, those terms will control to the extent that they conflict with this agreement. Buyers agree that if any part of this agreement should happen to violate an applicable law, all other parts of this agreement shall not be affected.

ACTIONS BY SELLER NOT AFFECTING OBLIGATIONS OF BUYERS: Buyers agree that Seller may take any of the following actions at any time and any number of times, without notice, without relieving Buyers of any of their obligations under this agreement: extend the time of payment, postpone or delay collection, take a new promissory note or obligation for or in connection with this agreement, reduce the amount payable under this agreement, change the time or place for payment, change the number of parties to this agreement or the obligations of some of the parties to this agreement, release any security for this agreement, fail to enforce any security interest taken in connection with this agreement, release any party to this agreement from any further obligation, agree not to sue any party for collection of this agreement, or assign this agreement at any time to another person or corporation.

OBLIGATIONS OF BUYERS REGARDING GOODS: Buyers agree that they will keep possession of all goods and not dispose of any of them nor permit or cause any other person to claim any rights in the goods. Buyers agree to keep the goods repaired and in good condition. Buyers agree that any loss of or damage to any goods is at their risk and is their responsibility regardless of the cause of the loss or damage. Buyers agree that none of the goods will be attached to any real estate (including buildings) in such a way that it cannot be easily removed without damaging the goods or the real estate (including buildings). Buyers agree not to change permanently the place where the goods are stored or harbored without the prior approval of the Seller. Buyers agree that if Seller requests, they will make all of the goods available to the Seller at any reasonably convenient place the Seller may designate. Buyers agree to comply with all registration, licensing, tax and title laws applicable to any of the goods. Buyers agree that none of the goods will be used in any manner contrary to any law. Buyers agree that they will not sell or otherwise transfer ownership of the goods securing this agreement without immediately paying the Seller all amounts still owing on this agreement. If Buyers wish to sell or transfer the goods securing this agreement to someone who agrees to assume the balance of this agreement, Buyers must obtain the written approval of the Seller to the assumption, or the Seller may ignore the assumption, and Buyers will remain primarily liable for the balance owing.

RIGHTS OF SELLER REGARDING GOODS: If Buyers fail to fully comply with any of the terms of this agreement, Seller shall have, but will not be limited to, the right to do any of the following upon notice and subject to Buyers' right to cure in accordance with state law: enter any house or other building and on any real estate, take possession of goods wherever they may be found, and sell any of the goods for cash or credit. Buyers agree that any notice required shall be reasonable if mailed to them at their last known address at least 10 days prior to the time of sale. Buyers agree that if the information is not available at the time of signing this agreement, Seller may insert identifying numbers or marks of the goods in the space for description of goods on the other side of this document.

ATTORNEY FEES AND COURT COSTS: Buyers agree to pay court costs and Seller's reasonable attorney fees, as allowed by law, after default and referral to an attorney who is not a salaried employee of the Seller or his assignee.

**Warranties Seller Disclaimer: Buyers understand that Seller makes no express or implied warranties of merchantability or of fitness for a particular purpose covering the property unless the property is for personal, family, or household use and the Seller either makes a written warranty or at the time of sale or within 90 days thereafter enters into a service contract with the buyers which applies to the property. The provision does not affect any warranties covering which may be provided by the manufacturer of the property or any warranties which may be provided by applicable state law.**

An implied warranty of merchantability generally means that the property is fit for the ordinary purpose for which such property is generally used. A warranty of fitness for a particular purpose is a warranty that may arise when the Seller has reason to know the particular purpose for which Buyers require the property and buyers rely on the Seller's skill or judgment to furnish suitable property.

GOVERNING LAW: The terms of this agreement shall be governed by the laws of California.

## NOTICE

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**The preceding NOTICE applies only to goods or services obtained primarily for personal, family, or household use. In all other cases, Buyers will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyers (debtors) may have against the Seller, or against the manufacturer of the property obtained under this contract.**

---

The printing contained in this box is not part of Buyers' agreement.

### ASSIGNMENT BY SELLER

For value received, we hereby assign within contract and all our right, title and interest in it and in its collateral to Banc of America Specialty Finance, Inc. (Assignee), and warrant all of the following: 1) that this contract is the result of a sale of our own property or services; 2) that we have full and perfect title to and right to convey this contract free of any encumbrance, lien, or any interest of third parties of any nature whatsoever; 3) that all services and installation work in connection with this contract will be completed according to the contract at the time this contract is sold to the Assignee; 4) that this contract accurately and correctly reflects a genuine, bona fide sale and the price and terms thereof, and is valid and in compliance with any applicable installment sales law or other applicable state or federal law or administrative regulation; 5) that the goods or services covered by this contract have been unconditionally accepted by the parties to the contract; 6) that at the time this contract is sold to the Assignee, the goods and services are in the possession of the obligor and are the identical goods and services described in or related to the contract; 7) that the amount due from the obligor is not disputed or subject to any set-off, defense, credit or counterclaim; 8) that there is no undisclosed delinquency; 9) that the downpayment is correctly stated in the contract; 10) that we have received cash, or its proper equivalent, for the downpayment, no part of which was loaned by us, directly or indirectly, to the Buyers; 11) that this contract is the entire and sole contract between us and the obligor as to the sale of goods or services evidenced herein; 12) that there is no undisclosed agreement, concession or litigation of any nature affecting this contract; 13) that all the parties to this contract were competent at the time it was executed; 14) that there are no valid defenses in law or equity to this contract as it exists in the hands of the Assignee after this conveyance; and 15) that all signatures on this contract are genuine. If any of the foregoing warranties are untrue, regardless of Assignee's knowledge or lack of knowledge or reliance thereon, Assignor hereby unconditionally agrees to repurchase the documents on demand from Assignee for the balance remaining unpaid plus any expense of collection, repossession, foreclosure, transportation, or storage, attorney fees, and court costs incurred by Assignee less any customary refund by Assignee of unearned finance charges. FURTHER, if a "With Recourse" assignment is initialed below, we engage that the within contract will be paid according to its tenor and that if it is not, we shall pay it to the Assignee or to any subsequent assignee, regardless of the order in which the assignments are made. If a "With Limited Recourse" assignment is initialed below, we engage that the within contract will be paid according to its tenor for the period shown below, and that if it is not, we shall pay it to the Assignee or to any subsequent assignee, regardless of the order in which the assignments are made. If a "Repurchase" assignment is initialed below, we engage that if Assignee or any subsequent assignee repossesses any of the collateral on this contract, we will repurchase the collateral for the unpaid

free of any encumbrance, lien, or any interest of third [...] f any nature whatsoever; 3) that all services and this [...] the Assignee, 4) that this contract accurately and co... ly reflects a genuine bona fide sale and the price and terms thereof, and is valid and in compliance with any applicable installment sales law or other applicable state or federal law or administrative regulation, 5) that the goods or services covered by this contract have been unconditionally accepted by the parties to the contract; 6) that at the time this contract is sold to the Assignee, the goods and services are in the possession of the obligor and are the identical goods and services described in or related to the contract; 7) that the amount due from the obligor is not disputed or subject to any set-off, deduction, credit or counterclaim; 8) that there is no undisclosed delinquency; 9) that the downpayment is correctly stated in the contract; 10) that we have received cash, or its proper equivalent, for the downpayment, no part of which was loaned by us, directly or indirectly, to the Buyers; 11) that this contract is the entire and sole contract between us and the obligor as to the sale of goods or services evidenced herein; 12) that there is no undisclosed agreement, concession or litigation of any nature affecting this contract; 13) that all the parties to this contract were competent at the time it was executed; 14) that there are no valid defenses in law or equity to this contract as it exists in the hands of the Assignee after this conveyance; and 15) that all signatures on this contract are genuine. If any of the foregoing warranties are untrue, regardless of Assignee's knowledge or lack of knowledge or reliance thereon, Assignor hereby unconditionally agrees to repurchase the documents on demand from Assignee for the balance remaining unpaid plus any expense of collection, repossession, foreclosure, transportation, or storage, attorney fees, and court costs incurred by Assignee less any customary refund by Assignee of unearned finance charges. FURTHER, if a "With Recourse" assignment is initialed below, we engage that the within contract will be paid according to its tenor and that if it is not, we shall pay it to the Assignee or to any subsequent assignee, regardless of the order in which the assignments are made. If a "With Limited Recourse" assignment is initialed below, we engage that the within contract will be paid according to its tenor for the period shown below, and that if it is not, we shall pay it to the Assignee or to any subsequent assignee, regardless of the order in which the assignments are made. If a "Repurchase" assignment is initialed below, we engage that if Assignee or any subsequent assignee repossesses any of the collateral on this contract, we will repurchase the collateral for the unpaid balance of the contract, or its fair market value, whichever is higher. If a "Without Recourse" assignment is initialed below, this Assignment is without recourse.

With Recourse _____
      Seller initials

With Limited Recourse for first
_____ months of contract _____
            Seller initials

Repurchase Agreement _____
            Seller initials

Without Recourse _____
      Seller initials

Seller/Assignor _____

By _____

Date ____ 5-1-0_ ____

CALIFORNIA IB RIP-MARINE, FORM 005-3939   1/00

EXHIBIT 5

NCCC
### TERMS AND CONDITIONS OF CONTRACT PURCHASES
### AND RESERVE TRANSACTIONS

TO:
**BLUE PORPOISE MARINE**
**1455 WEST MARINA BLVD**
**SAN DIEGO, CA  92113**

FROM:  NATIONSCREDIT COMMERCIAL CORPORATION

We, from time to time, will buy from you retail installment contracts, credit sales agreements, chattel mortgages, promissory notes, security agreements, and other title retaining or lien instruments (hereinafter referred to as "Contracts") evidencing your time sales of recreational vehicles, boats, motors, trailers, recreational products, accessories, and certain allied products (hereinafter referred to as "Property"). Purchase of Contracts from you will be subject to our existing credit policies. This document states the terms under which we will buy Contracts from you and shall be applicable to all such transactions purchased from you as of 11-4-96 . This document replaces and/or amends any previous terms and conditions of contract purchase agreements, however, it does not negate, minimize or release the dealer from any liability described in the aforementioned document for transactions purchased under it.

I.   PURCHASING OF CONTRACTS/RESERVE CREDITS
The following will define the amounts you will be paid for Contracts we purchase ("Purchase Price") and the amounts which will be credited to an accrual account (hereinafter referred to as "Reserve").
The Unpaid balance is defined as the Cash Price of goods or services you sell to your customer, less the total customer down payment.

Either Plan A,B or C below will control the Purchase Price and the amount of Reserve for all Contracts we purchase (one Plan must be checked and initialed).

[✓]   PLAN A  -  Present Value Method:  A Reserve will be established using the "Present Value Method" of calculation, which is defined as:  "We will pay to a dealer Reserve the difference between two principal amounts - one principal amount calculated at the "sell rate" and another calculated at the "buy rate". The payment amount in both cases will be the same."

[ ]   PLAN B  -  Limited Contingent Liability:  This program allows the Dealer to limit contingent liability associated with pre-payments on the contracts with longer-terms:

(a) for contracts with terms 60 months or less, the Dealer will earn a Reserve based upon the "Present Value Method" stated in "PLAN A" above; and...

(b) For contracts with terms greater than 60 months, Dealer will be paid up front "participation" calculated as follows:  for each .25% increase in the minimum buy rate, the dealer receives 1.00% of the amount financed.  The maximum participation amount is 5% of the amount financed.  No amount will be placed into a reserve.

[ ]   PLAN C  -  Future Value Paid as Earned:  A Reserve will be established using the "Future Value Method" of calculation, which is defined as:  "We will pay to a dealer Reserve the difference between two total note amounts - one note amount calculated at the customer payment amount based on the "sell rate" and another _____ based on the "buy rate".

B. Subject to the provisions of Paragraph II.A. above, we will pay you part or all of the Reserve balance in accordance with the schedule designated below:

PLAN A:    75% of the reserve will be paid at the time contract is purchased. NationsCredit Commercial Corporation (NCCC) will retain the remaining 25% to use at its sole discretion. Dealer's payment will be subject to "pre-payment" refunds at all times. Additionally, Dealer's payment must be fully refunded to NCCC upon request, if "pre-payment" occurs within the first 120 days.

PLAN B:    Depending on the term of the contract, the dealer will be paid in accordance with the following:

    (a)  For contracts with terms 60 months or less, Dealer will be paid as outlined in "Plan A" above; and...

    (b)  For contracts with terms greater than 60 months, participation will be  paid up front at the time the contract is purchased.  In the event of "pre-payment" within the first 12 months, dealer will refund to NCCC , on a pro-rata basis, any unearned  participation paid, upon demand.

Note:   The "pre-payment" terminology used in "PLAN A" and "PLAN B" above has been previously defined under Paragraph II.A.6., 6a. and 6b., of this Agreement.

PLAN C:    Dealer will be paid the difference in the finance charge calculated at the "sell rate" and the "buy rate" each month the customer makes a payment.  On interest bearing contracts, the amount earned is based on the net balance.  On pre-computed contracts, total finance charge over the term of contract is calculated and the monthly payment is based on "straight-line".

For contracts under the "Preferred Customer" program , participation will be paid up front at the time the contract is purchased. In the event of Pre-Payment within the first 12 months, dealer will refund to NationsCredit, on a pro-rata basis, any unearned participation, upon demand.

If, for any reason, the purchasing of Contracts is discontinued, then, notwithstanding the terms of Paragraph II.B., above, we shall not be required to make any further Reserve disbursements to you until all Contracts theretofore purchased have been liquidated.  We also reserve the right to hold and apply any Reserve balances (together with any and all outstanding Deferred Certificates) to any indebtedness then due us or as thereafter may become due us from you.

C. You hereby grant a security interest in favor of us in all amounts credited to the Reserve to secure all obligations of yours to us under this Agreement and any other Contract we may have with you.  You agree that a carbon, photographed or other reproduction of this Agreement, or a financing statement is sufficient as a financing statement under this Agreement.

### III. RESERVE STATEMENT

So long as you are doing business as a going concern, we will provide, to you, a periodic statement of the Reserve account, detailing all credits and disbursements as provided for by this Agreement.  Upon its receipt, you will promptly notify us, in writing, of any discrepancies.  Unless such notice is received by us within thirty (30) days of the date of the Reserve statement, the information therein shall be conclusively deemed correct and complete.

### IV. GENERAL

A. Both of us agree to the waiver of trial by jury in any court, in any suit, action or proceeding arising on, out of or relating to any claim or dispute arising out of this Agreement or any other agreement between us, including the validity and interpretation thereof.

B. We may extend the time of payment of any installment due under any Contracts.  We may revise, adjust, compromise, settle and release the obligation of any customer and we may transfer the Contract of any customer to a third party.

C. Any release of the obligation of a customer by any operation of the law, whether or not caused by our failure to comply with the duties and obligations imposed upon a secured party under the Uniform Commercial Code, shall not affect our right to charge the Reserve in accordance with the terms set forth by this document.

# CIVIL COVER SHEET
ORIGINAL

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

| I (a) PLAINTIFFS BANC OF AMERICA SPECIALTY FINANCE, INC., a North Carolina Corporation, successor-in-interest and formerly known as NATIONSCREDIT COMMERCIAL CORPORATION OF AMERICA | DEFENDANTS APOLLO FISHERIES SERVICE, INC. dba BLUE PORPOISE MARINE; NATALIE GUNNS-GLADNICK, an individual; RONALD GLADNICK, an individual  01 JUL -5 PM 4:05 |
|---|---|
| (b) COUNTY OF RESIDENCE OF FIRST LISTED Fulton County, PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES) Georgia | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY)   San Diego    NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED   DEPUTY |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Jennie La Prade #82224 Richard M. Segal #156975 Michelle L. Adams #198956 PILLSBURY WINTHROP LLP 101 West Broadway, Ste. 1800 San Diego, CA 92101 | ATTORNEYS (IF KNOWN)   '01 CV 1206 BTM (LSP) |

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN X IN ONE BOX (For Diversity Cases Only) FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

28 U.S.C. § 1332(a)

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | Medical Malpractice | ☐ 625 Drug Related Seizure | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - | of Property 21 USC 881 | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 330 Federal Employers' | Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| &Enforcement of Judgment | Liability | ☐ 368 Asbestos Personal Injury | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 340 Marine | Product Liability | ☐ 650 Airline Regs | **SOCIAL SECURITY** | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities Exchange |
| | ☐ 355 Motor Vehicle Product | ☐ 371 Truth in Lending | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☐ 160 Stockholders Suits | Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☒ Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 791 Empl. Ret. Inc. | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | ☐ Security Act | | |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 | DEMAND $402,350.92 | CHECK YES only if demanded in complaint: JURY DEMAND: ☐ YES ☒ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY** (See Instructions)   JUDGE _____   Docket Number _____

DATE July 5, 2001     SIGNATURE OF ATTORNEY OF RECORD

CB #150 72815 07/05/01