















LMM   7/31/01   11:54
3:01-CV-01206   BANC OF AMERICA V. APOLLO FISHERIES
*15*
*REQJNTC.*

1  PILLSBURY WINTHROP LLP
   JENNIE L. LA PRADE # 82224
2  725 South Figueroa Street, Suite 2800
   Los Angeles, CA 90017-5406
3  Telephone: (213) 488-7100
   Facsimile: (213) 629-1033
4

5  PILLSBURY WINTHROP LLP
   RICHARD M. SEGAL #156975
6  MICHELLE L. ADAMS #198956
   101 West Broadway, Suite 1800
7  San Diego, CA 92101-8219
   Telephone: (619) 234-5000
8  Facsimile: (619) 236-1995

9  Attorneys for Plaintiff
   BANC OF AMERICA SPECIALTY FINANCE, INC.
10

FILED

01 JUL 30 PM 3: 33

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY

11              UNITED STATES DISTRICT COURT

12              SOUTHERN DISTRICT OF CALIFORNIA

13  _____
                                    )
14  BANC OF AMERICA SPECIALTY       )   Case No. 01cv1206 BTM (LSP)
    FINANCE, INC., a North Carolina )
15  Corporation, successor-in-interest and )   REQUEST FOR JUDICIAL NOTICE
    formerly known as NATIONSCREDIT )   REGARDING BANC OF AMERICA
16  COMMERCIAL CORPORATION OF       )   SPECIALTY FINANCE INC.'S
    AMERICA                         )   APPLICATION FOR EX PARTE
17                                  )   WRIT OF POSSESSION,
                        Plaintiff,  )   TEMPORARY RESTRAINING
18                                  )   ORDER AND TURN-OVER ORDER
        vs.                         )
19                                  )   Date:      TBA
    APOLLO FISHERIES SERVICE, INC. dba )   Time:      TBA
20  BLUE PORPOISE MARINE; NATALIE   )   Courtroom: 15
    CINTAS-GLADNICK, an individual, and )
21  RONALD GLADNICK, an individual, )   Hon. Barry T. Moskowitz
                                    )
22                      Defendants. )
                                    )
23                                  )
                                    )
24                                  )
    _____      )
25

26

27

28
   50143903v1                   - 1 -

REQUEST FOR JUDICIAL NOTICE REGARDING
BANC OF AMERICA SPECIALTY FINANCE INC.'S
APPLICATION FOR EX PARTE WRIT OF
POSSESSION, TEMPORARY RESTRAINING ORDER
AND TURN-OVER ORDER
Case No. 01cv1206 BTM (LSP)



1    Pursuant to Federal Rule of Evidence, Rule 201, Plaintiff Banc of America

2    Specialty Finance ("Specialty Finance") requests that this Court take judicial notice of the

3    Declaration of Kenneth Daigrenpont, including all exhibits thereto, in support of Specialty

4    Finance's Application for Ex Parte Writ of Possession, Temporary Restraining Order and

5    Turnover Order, a true and correct copy of which is attached hereto.

6         Dated: July 30, 2001.

7                             PILLSBURY WINTHROP LLP
                              JENNIE L. LA PRADE
8                             RICHARD M. SEGAL
                              MICHELLE L. ADAMS
9

10

11                           By _____
                                     Michelle L. Adams
12                                 Attorneys for Plaintiff
                              BANC OF AMERICA SPECIALTY FINANCE, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE REGARDING
BANC OF AMERICA SPECIALTY FINANCE, INC.'S
APPLCIATION FOR EX PARTE WRIT OF
POSSESSION, TEMPORARY RESTRAINING ORDER
AND TURN-OVER ORDER
Case No. 01cv1206 BTM (LSP)

1   PILLSBURY WINTHROP LLP
    JENNIE L. LA PRADE # 82224
2   725 South Figueroa Street, Suite 2800
    Los Angeles, CA 90017-5406
3   Telephone: (213) 488-7100
    Facsimile: (213) 629-1033
4

5   PILLSBURY WINTHROP LLP
    RICHARD M. SEGAL #156975
6   MICHELLE L. ADAMS #198956
    101 West Broadway, Suite 1800
7   San Diego, CA 92101-8219
    Telephone: (619) 234-5000
8   Facsimile: (619) 236-1995

9   Attorneys for Plaintiff
    BANC OF AMERICA SPECIALTY FINANCE, INC.

10

FILED

01 JUL 13 AM 11:30

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                          DEPUTY

11              UNITED STATES DISTRICT COURT

12              SOUTHERN DISTRICT OF CALIFORNIA

13

14

| | |
|---|---|
| 15  BANC OF AMERICA SPECIALTY FINANCE, INC., a North Carolina | Case No. 01cv1206 BTM (LSP) |
| 16  corporation, successor-in-interest and formerly known as NATIONSCREDIT | DECLARATION OF KENNETH DAIGREPONT IN SUPPORT OF |
| 17  COMMERCIAL CORPORATION OF AMERICA, | PLAINTIFF'S MOTION FOR WRIT OF POSSESSION AND TURNOVER |
| 18                        Plaintiff, | ORDER |
| 19     Vs. | Date:    August 21, 2001 |
| 20 | Time:    2:30 p.m. |
|     APOLLO FISHERIES SERVICE, INC. dba | Courtroom: 15 |
| 21  BLUE PORPOISE MARINE; NATALIE CINTAS-GLADNICK, an individual, and | Hon. Barry T. Moskowitz |
| 22  RONALD GLADNICK, an individual, | |
| 23                        Defendants. | [ORAL ARGUMENT REQUESTED BY COURT] |
| 24 | |

25

26

27

28

DECLARATION OF KENNETH DAIGREPONT

2     I, Kenneth Daigrepont, declare and state as follows:

3                    DECLARANT QUALIFICATIONS

4          1.      I am a Vice President and Special Assets Manager at plaintiff BANC OF

5     AMERICA SPECIALTY FINANCE, INC, a North Carolina corporation ("Specialty

6     Finance"), successor-in-interest to and formerly known as NATIONSCREDIT

7     COMMERCIAL CORPORATION OF AMERICA, with nearly 25 years in the business of

8     inventory floor plan lending. I make this Declaration in support of Specialty Finance's

9     Motion for Writ of Possession and Turnover Order. If called as a witness in this matter, I

10    could and would competently testify to the facts set forth herein based upon personal

11    knowledge and a review of Specialty Finance's books and records regarding the account of

12    customer Apollo Fisheries Service, Inc. dba Blue Porpoise Marine.

13         2.      As a Special Assets Manager at Specialty Finance, I am charged with a wide

14    range of responsibilities that includes the handling of defaults under inventory financing

15    agreements entered into by Specialty Finance. My experience includes negotiation,

16    evaluation, structuring, and re-structuring of flooring agreements with retail dealerships. I

17    have been involved with virtually every facet of the flooring industry during the course of

18    my career — ranging from performing inventory inspections and monitoring payments

19    made by debtors under flooring plans to negotiating and evaluating flooring plans.

20         3.      In my capacity as Special Assets Manager, I am required to and have

21    become personally familiar with the manner in which Specialty Finance's documents,

22    books, and records are prepared and made. The procedures in connection with financing

23    transactions are as follows: When a financing agreement is entered into, the original

24    documents created to memorialize and effectuate the transaction are signed by the

25    borrower After the borrower signs the original finance documentation and delivers the

26    signed originals to Specialty Finance, the manager and/or employee in charge of the

27    transaction causes all of the original documentation to be placed in a separate file, labeled

28

1  and stored separately in Specialty Finance's file room. This occurs at or about the time that

2  the original financing documentation is delivered to Specialty Finance. I have compared

3  the copies of all documents attached as exhibits to this declaration to the originals, and

4  observed that they are true and correct copies of those originals. The originals of each of

5  the exhibits attached to this declaration remain in the possession, custody, and control of

6  Specialty Finance.

7  　　　　4.　　　Specialty Finance maintains records of all its transactions in the regular

8  course of business, and it is Specialty Finance's practice and procedure to maintain such

9  records in the regular course of business. It is Specialty Finance's practice and procedure to

10 maintain records and to record transactions, acts, conditions, or events at or about the time

11 of the event or transaction being recorded. Specialty Finance employees are responsible for

12 observing and accurately recording transactions, events, conditions, and acts concerning

13 Specialty Finance and its customers, and Specialty Finance relies on said records in

14 connection with its business dealings with its customers.

15 　　　　5.　　　I am responsible for and in charge of the credit account of Apollo Fisheries

16 Service, Inc. dba Blue Porpoise Marine (hereinafter "Blue Porpoise"). As a Special Assets

17 Manager with Specialty Finance, I am a custodian of Specialty Finance's documents,

18 books, and records regarding its transactions with Blue Porpoise, and I presently have

19 possession of the records pertaining to Blue Porpoise's account. As part of my

20 responsibilities, I have personally reviewed Specialty Finance's documents, books, and

21 records regarding Blue Porpoise. Because Specialty Finance's records regarding Blue

22 Porpoise are too voluminous to be attached to this declaration in their entirety, only certain

23 records on which I have relied are attached hereto as exhibits.

24 　　　　THE INVENTORY AGREEMENT AND THE COLLATERAL

25 　　　　6.　　　Specialty Finance's documents, books, and records regarding Blue Porpoise

26 indicate as follows:

27

28

DECLARATION OF KENNETH DAIGREPONT IN
SUPPORT OF PLAINTIFF'S MOTION FOR WRIT OF
POSSESSION AND TURNOVER ORDER
Case No. 01cv1206 BTM (LSP)

1        a.     Defendant Blue Porpoise is a Corporation doing business in the

2  County of San Diego, California.

3        b.     On or about July 29, 1997, Specialty Finance on the one hand and

4  Blue Porpoise, through its president, Natalie Cintas-Gladnick, entered into a written

5  agreement entitled "Security Agreement-Inventory" ("Agreement"). A true and correct

6  copy of the Agreement is attached hereto as Exhibit 1.

7        c.     Pursuant to the Agreement, Specialty Finance agreed to finance Blue

8  Porpoise's purchase of boat and engine inventory by extending credit to Blue Porpoise in

9  such amounts as Specialty Finance in its sole discretion would decide to grant. Pursuant to

10  the terms of the Agreement, Blue Porpoise promised to repay Specialty Finance the amount

11  of funds advanced by Specialty Finance toward inventory purchases by Blue Porpoise,

12  according to the terms prescribed in the Agreement. Under the Agreement, Blue Porpoise

13  is required to pay all obligations when due as indicated on any statement submitted to it by

14  Specialty Finance, and in any event to pay a manufacturer's invoice in full, or whatever

15  balance remains after any curtailment payments, when the unit is sold by Blue Porpoise or

16  when the unit is deemed mature, 360 to 365 days after the date of the manufacturer's

17  invoice. Moreover, as mandated by the manufacturer in connection with the repurchase

18  agreement with Specialty Finance, Blue Porpoise may be required to pay specific

19  percentages of the total amount of the invoice, or "curtailments" at specific interval dates

20  following the invoice date. Blue Porpoise's repayment program is referred to as the "Pay

21  As Sold" program. Failure to pay a manufacturer's invoice, less any paid curtailments, in a

22  timely manner following the sale of Specialty Finance-financed inventory constitutes a

23  default under the Agreement. Additionally, Blue Porpoise is obligated to pay interest on

24  past due amounts at the rate of 15% per annum, or as otherwise set forth in the periodic

25  statements.

26        d.     Under the Agreement, Blue Porpoise granted to Specialty Finance a

27  security interest in all of Blue Porpoise's inventory and other personal property (the

28

1  "Collateral") to secure payment of all indebtedness due to Specialty Finance from Blue

2  Porpoise under the Agreement. The Agreement defines inventory to include, among other

3  things:

4         "All of the Debtor's inventory, equipment, accounts, contract

5         rights (including but not limited to any purchase and rental agreements),

6         chattel paper, documents and general intangibles, of whatever kind or

7         nature, wherever located, now owned or hereafter acquired, and all

8         returns, repossessions, substitutions, replacements, parts, additions and

9         accessions, thereto and thereof, and all proceeds (including but not limited

10        to cash, instruments, chattel paper, general intangibles and accounts) and

11        products thereof."

12         e.       In order to perfect its security interest in the Collateral, Specialty

13  Finance recorded an executed UCC-1 Financing Statement with the Office of the California

14  Secretary of State on August 22, 1997. A true and correct copy of said UCC-1 financing

15  statement (the "Financing Statement") is attached hereto as Exhibit 2.

16         f.       Under the Agreement, "any breach or failure by Dealer [Customer]

17  to pay or perform any Obligations… hereunder" owed to Specialty Finance is one of the

18  bases for default.

19         g.       By May 31, 2001, Blue Porpoise was in default under the Agreement

20  as a result of its failure to make payments due, including its failure to pay for matured items

21  financed by Specialty Finance in the amount of $28,821.10. The principal and interest

22  payments due from Blue Porpoise to Specialty Finance as of May 31, 2001 are set forth in

23  the "Monthly Activity Summary 04/27/01 – 05/31/01" attached hereto as Exhibit 3. As a

24  result of these defaults, Specialty Finance has accelerated Blue Porpoise's indebtedness and

25  has demanded that Blue Porpoise pay the entire outstanding indebtedness; Blue Porpoise

26  has failed and refused to do so. Specialty Finance has made demand on Blue Porpoise for

27  the return of the Collateral. Blue Porpoise has failed to turn over to Specialty Finance any

28

1    of the Collateral subject to the Agreement, including the inventory that Specialty Finance

2    has financed.

3          7.     Specialty Finance has performed all of the terms and conditions of the

4    Agreement on its part to be performed.

5          8.     The Agreement provides that in the event of any default by Blue Porpoise,

6    all obligations under the Agreement would, at the discretion of Specialty Finance and

7    without notice, become accelerated and immediately due and payable.

8          9.     The Agreement further provides that Specialty Finance may collect amounts

9    owing under the Agreement and charge the costs and expenses of collection to the amount

10    Blue Porpoise owes, and that Blue Porpoise is obligated to pay to Specialty Finance all

11    reasonable attorney's fees, costs, and expenses incurred in collecting the indebtedness or

12    otherwise enforcing Specialty Finance's rights under the Agreement.

13        10.     To date, Specialty Finance has advanced funds on behalf of Blue Porpoise,

14    and Blue Porpoise has failed to make payments on invoices totaling $234,475.00 (which

15    total amount is reflected in the Dealer Summary attached as Exhibit 4); which includes

16    past-due curtailment charges through and including June 27, 2001 in the amount of

17    $3,946.39; together with accrued interest thereon through and including May 31, 2001 in

18    the amount of $2,826.92; together with interest accruing from May 31, 2001, until the

19    amounts owed by Blue Porpoise to Specialty Finance under the Agreement are paid in full;

20    together with all costs and reasonable attorneys' fees incurred or to be incurred to enforce

21    the Agreement; together with all other charges and fees due under the terms of the

22    Agreement; less the value obtained after the commercially reasonable disposition of all

23    Collateral repossessed from Blue Porpoise.

24                        __THE RETAIL CONTRACT__

25        11.     On or about May 1, 2000, Blue Porpoise assigned to Specialty Finance and

26    Specialty Finance purchased from Blue Porpoise ("Assignment") a Security Agreement and

27    Disclosures Statement dated as of May 1, 2000, entered into by and between Blue Porpoise

28

1   and Jerry and Joellen Saline ("Salines") relating to the retail purchase and financing by the

2   Salines of a 1999 Albermarle 320 Express, Hull Number XWR32118E899 ("Contract"). A

3   true and correct copy of the Contract, together with the Assignment, is attached hereto as

4   Exhibit 5.

5       12.     Pursuant to its Assignment of the Contract, Blue Porpoise made

6   certain warranties including: (1) that the Contract is the result of a sale of Blue

7   Porpoise's own property; (2) that Blue Porpoise has full and perfect title to and right

8   to this Contract free of any encumbrances, lien, or any interest of third parties of any

9   nature whatsoever; (3) that this Contract accurately and correctly reflects a genuine,

10  bona fide sale and the price and terms thereof, and is valid and in compliance with

11  any applicable installment sales law or other applicable state or federal law or

12  administrative regulation; (4) that the goods or services covered by this Contract

13  have been unconditionally accepted by the parties to the services covered by the

14  parties to the Contract; (5) that the amount due from the obligor is not disputed or

15  subject to any set-off, deduction, credit or counterclaim; and (6) that there are no

16  valid defenses in law or equity to the Contract as it exists in the hands of the

17  Specialty Finance after this conveyance.

18      13.     Specialty Finance has since learned that the foregoing warranties

19  were not true when made due to the following: (1) title to the boat was not in the

20  name of Blue Porpoise but a principal of Blue Porpoise; (2) the boat was subject to a

21  mortgage held by Boston Whaler Financial Services in the amount of approximately

22  $230,000, and such mortgage has not been released as of the date of the assignment

23  or subsequently; and (c) the Salines dispute the legality and validity of the purchase

24  of the boat and the Contract and had asserted various defenses to the enforcement of

25  the Contract.

26

27

28

1    14.    Pursuant to the Assignment, if any of the warranties are untrue, Blue

2    Porpoise will be determined to have defaulted on the Assignment and is required to

3    repurchase the Contract on demand for the remaining unpaid balance.

4    15.    As a result of Blue Porpoise's default, Specialty Finance has

5    demanded, and hereby demands, that Blue Porpoise repurchase the Contract for the

6    full purchase price in the amount of $165,049, together with interest accruing from

7    May 1, 2000 until the amounts owed by Blue Porpoise to Specialty Finance under

8    the Assignment are paid in full; together with all costs and reasonable attorneys'

9    fees incurred or to be incurred to enforce the Assignment; together with all other

10    charges and fees due under the terms of the Assignment.

11          SPECIALTY FINANCE DAMAGES

12    16.    Specialty Finance's practice and procedure is to maintain records of all

13    invoices representing goods financed by Specialty Finance, and all disbursements made and

14    all payments received on account of Specialty Finance's financing agreements with its

15    customers. The ordinary course of Specialty Finance's record keeping activities is to record

16    receipt of payments from Blue Porpoise in Specialty Finance's computerized loan

17    accounting system. If Specialty Finance's records do not reflect receipt of a payment in a

18    given time period, that is a trustworthy indication that the payment, in fact, was not

19    received by Specialty Finance on account of that financing transaction during that period.

20    Any payments received by Specialty Finance from Blue Porpoise pursuant to the

21    Agreement and the invoices financed would be recorded in the same manner as described in

22    this paragraph.

23    17.    The most recent Dealer Summary for Blue Porpoise, attached as Exhibit 4,

24    shows the principal currently owing by Blue Porpoise to Specialty Finance pursuant to the

25    Agreement. As a result of Blue Porpoise's default, there is presently due, owing, and

26    unpaid from Blue Porpoise to Specialty Finance on the Agreement the principal amount of

27    $234,475.00; which includes past-due curtailment charges through and including June 27,

28

1  2001 in the amount of $3,946.39; together with accrued interest thereon through and

2  including May 31, 2001 in the amount of $2,826.92; together with interest accruing from

3  May 31, 2001 until the amounts owed by Blue Porpoise to Specialty Finance under the

4  Agreement are paid in full; together with all costs and reasonable attorneys' fees incurred or

5  to be incurred to enforce the Agreement; together with all other charges and fees due under

6  the terms of the Agreement; less the value obtained after the commercially reasonable

7  disposition of all Collateral repossessed from Blue Porpoise.

8      18.    By letter from Specialty Finance's counsel to Blue Porpoise dated June 27,

9  2001, a copy of which is attached as Exhibit 6, Specialty Finance notified Blue Porpoise

10  that it was in default on payments due under the Agreement, and based thereon, Specialty

11  Finance demanded payment on all past due invoices. Additionally, by that same letter,

12  Specialty Finance made demand on Blue Porpoise for the turnover of all Collateral as

13  defined in the Agreement, as a result of its default on payments due under the Agreement.

14      19.    Because of Blue Porpoise's continuing defaults under the Agreement,

15  Specialty Finance could no longer forebear from exercising its rights and remedies, and

16  thus commenced the instant legal action against Blue Porpoise.

17      20.    As a result of Blue Porpoise's breach of the Agreement, Specialty Finance is

18  entitled to the immediate and exclusive possession of the Collateral.

19      21.    To date, Blue Porpoise has not delivered to Specialty Finance the exclusive

20  possession of the Collateral subject to the Agreement.

21                    <u>LOCATION OF THE COLLATERAL</u>

22      22.    According to Specialty Finance's records and based on Specialty Finance's

23  recent floor check, the following boat and engine inventory Collateral is kept at the Blue

24  Porpoise Marine facility located at 1455 West Morena Blvd., San Diego, CA 92110:

25              Model No. 208ADVEN
              Serial No. NTLAD570J
26
              Model No. 200 HP
27              Serial No. 100119

28

50141987v1                    – 9 –        DECLARATION OF KENNETH DAIGREPONT IN
                                           SUPPORT OF PLAINTIFF'S MOTION FOR WRIT OF
                                           POSSESSION AND TURNOVER ORDER
                                           Case No. 01cv1206 BTM (LSP)

1

Model No. 209ESCAP
Serial No. NTLSC569K

2

Model No. 200 HP
3
Serial No. 101202

4

Model No. 208ADVEN
Serial No. NTLAD675C

5

Model No. 233TOURN
6
Serial No. NTLBK325

7

Model No. 200 HP
Serial No. 102730

8

Model No. 200 HP
9
Serial No. 1AX105885

10

Model No. 300MARLI
Serial No. NTLEA341

11

Model No. 250 HP
12
Serial No. 1BX103159

13

Model No. 247ADVEN
Serial No. NTLST338

14

Model No. 115 HP
15
Serial No. 800507

16

Model No. 115 HP
Serial No. 702198

17

VERIFICATION OF SIGNATURE

18

23.     In the course of Specialty Finance's normal business activities, I and other

19

employees of Specialty Finance have sent correspondence and documentation for signature

20

to Blue Porpoise's principal Natalie Cintas-Gladnick.  Within a few days after sending the

21

correspondence and documentation to Blue Porpoise, we received a response that bears the

22

signature of Natalie Cintas-Gladnick.  Based on my familiarity with Natalie Cintas-

23

Gladnick's signature obtained during the ordinary course of my handling of this account, I

24

believe that the Agreement, the Financing Statement and the Natalie Cintas-Gladnick

25

Guaranty bear the signature of Natalie Cintas-Gladnick.  I have personally spoken by

26

telephone with Natalie Cintas-Gladnick to discuss the outstanding indebtedness owed by

27

Blue Porpoise to Specialty Finance.  Natalie Cintas-Gladnick has never disputed that the

28

50141987v1

- 10 -

1     debt represented by the Agreement is an obligation of Blue Porpoise or that Specialty

2     Finance has a security interest in the Collateral as evidenced by the Financing Statement.

3     Moreover, Blue Porpoise has acknowledged its indebtedness under the Agreement (which

4     document bears Natalie Cintas-Gladnick's signature) by making payments to Specialty

5     Finance pursuant to the Agreement.

6                        <u>VALUE OF THE COLLATERAL</u>

7           24.    Based on the Dealer Item Detail, a true and correct copy of which is attached

8     as Exhibit 7, the existing debt owed by Blue Porpoise to Specialty Finance exceeds the

9     current value of the boat and engine inventory Collateral referenced above. The Dealer

10    Item Detail shows the amounts that Specialty Finance advanced Blue Porpoise for its

11    purchase of all of the boat and engine inventory in the total amount of $234,475.66. Given

12    that the principal amount owing to Specialty Finance is $234,475, plus curtailments in the

13    amount of $3,946.39, plus interest through May 31, 2001 in the amount of $2,826.92 for a

14    total indebtedness of $241,248.31, and further that Blue Porpoise owes Specialty Finance

15    the principal amount of $165,049 resulting from Specialty Finance's purchase of a retail

16    contract from Blue Porpoise based on Blue Porpoise's fraudulent representations, Blue

17    Porpoise does not have any equity interest in the remaining boat and engine inventory.

18    Although Blue Porpoise has no equity interest in the Collateral (the value of the Collateral

19    is $234,475.66, compared to the principal amounts due and owing to Specialty Finance of

20    $399,524.66), Specialty Finance nevertheless intends to post a bond thereon in the amount

21    of $234,475.

22          25.    Under the facts set forth above, Specialty Finance prays that this Court issue

23    an Order for a Writ of Possession and a Turnover Order against Blue Porpoise, with regard

24    to the Collateral described above. Specifically, Specialty Finance prays that this Court

25    issue an Order granting Specialty Finance immediate possession of its boat inventory

26    Collateral for further disposition.

27

28

1    I declare under penalty of perjury under the laws of the United State of America that

2    the foregoing is true and correct.

3        Executed this 5th day of July 2001, at Alpharetta, Georgia.

4

5    _____

6    Kenneth Daigrepont

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF KENNETH DAIGREPONT
Case No. _____

EXHIBIT 1

# SECURITY AGREEMENT - INVENTORY

1. PARTIES - The parties to this Security Agreement are **NationsCredit Commercial Corporation of America** (hereinafter "Secured Party") and **Apollo Fisheries Service, Inc. dba Blue Porpoise Marine** (hereinafter "Dealer")

2. ADVANCES - Dealer is engaged in the business of buying, selling and generally dealing in new and used **marine products** and may from time to time, obtain from Secured Party such sums of money as Secured Party, in its discretion, may advance to Dealer (or on behalf of Dealer) for the purchase of inventory, and which advances are to be secured by the security interests granted by this Agreement

3. SECURITY INTEREST AND COLLATERAL - To secure repayment by Dealer of all Obligations (as defined below). Dealer hereby grants to Secured Party a continuing security interest in the following property of Dealer (hereinafter collectively called the "Collateral")

( A ) All of the Dealer's presently owned and hereafter acquired Inventory, wherever located, and the Proceeds thereof. The term "Inventory" means **All of the Debtor's inventory, equipment, accounts, contract rights (including but not limited to any purchase and rental agreements), chattel paper, documents and general intangibles, of whatever kind or nature, wherever located, now owned or hereafter acquired, and all returns, repossessions, substitutions, replacements, parts, additions and accessions, thereto and thereof, and all proceeds (including but not limited to cash, instruments, chattel paper, general intangibles and accounts) and products thereof.**

( B ) All monies and credits, owing or to become owing at any time to Dealer from any manufacturer and/or distributor selling Inventory to Dealer. Such monies and credits shall include, but not be limited to. rebates, factory credits, volume incentives, advertising credits and price protection becoming payable at any time to Dealer from manufacturers and/or distributors

The term "Proceeds" as used above and elsewhere in this Agreement shall mean all cash and non-cash proceeds received by Dealer or on its behalf upon the sale or lease of Inventory or otherwise in connection with the Inventory. Non-cash proceeds shall include, without limitation, all accounts, contract rights, chattel paper, leases, rental contracts and instruments (as those terms are defined in the Uniform Commercial Code to the extent defined therein) and any amounts payable pursuant to policies of insurance covering Inventory

The term "Dealer Receivables" as used herein shall mean and include the monies and credits in which Secured Party is granted a security interest pursuant to (B) above

The term "Obligations" as used in this Agreement shall mean and include the following

( i )   All indebtedness owing or to become owing for advances made by Secured Party to Dealer from time to time under this Agreement

( ii )   Any other liabilities and obligations of Dealer, whether monetary or otherwise, now existing or hereafter arising in favor of Secured Party, including any attorney's fees and expenses to which Secured Party may be entitled as further provided in this Agreement

4.  DEALER'S REPRESENTATIONS AND AGREEMENTS -
( A ) Dealer represents that its principal place of business and chief executive office is located at its address shown below

| 1455 W. Morena Blvd. | San Diego | | CA | 92110 |
|---|---|---|---|---|
| Street Address | City | County | State | Zip |

( B ) Dealer will execute and deliver to Secured Party all financing statements requested by Secured Party and will pay all costs of filing the same, and authorizes Secured Party to sign financing statements for Dealer. A copy of this Agreement or any financing statement may be filed as a financing statement. Dealer will maintain a first priority security interest in favor of Secured Party in the Collateral, subject only to other liens acceptable to Secured Party in its discretion

( C ) Dealer will, upon the purchase of each new or used item of Inventory, at the request of Secured Party, deliver the Certificate of Title or Certificate of Origin, if any, issuable for such item to Secured Party, and Secured Party shall have the right to have its security interest noted thereon and to retain in its possession such Certificate of Title or Certificate of Origin

( D ) Dealer shall keep complete and accurate records of its business, which shall be available for Secured Party's inspection at all reasonable times, and will furnish to Secured Party such information regarding its business and financial condition as may be requested. Secured Party may enter the premises of Dealer to perform reasonable inventory inspections, at Dealer's expense.

( E ) Dealer agrees that Secured Party may, at all times, use and apply any or all Dealer Receivables toward the payment of Obligations which are due and unpaid, in whole or in part, that Secured Party may notify and direct the parties owing the same to make payment thereof to Secured Party for application to the payment of due and unpaid Obligations, without prior notification to Dealer

( F ) Dealer will not sell, consign, transfer or otherwise deliver any Collateral or interest therein to any person, other than in Dealer's ordinary course of business

( G ) Dealer will keep the Collateral in good order and repair and will pay all taxes, assessments or charges which may be levied or assessed against the same, and in the event of its failure to comply with the foregoing, Secured Party may expend such amounts as it, in its sole discretion may deem to be necessary to repair or put the Collateral into operating condition or to pay any and all taxes, assessments, charges or encumbrances to be discharged, which amounts shall be considered Obligations

( H ) Dealer will keep the Collateral insured for full value against all insurable risks, with loss payable to Secured Party as its interest may appear under the policies which are subject to cancellation upon no less than thirty (30) days written notice to Secured Party. Should Dealer fail to procure such insurance. Secured Party may procure the same and the cost thereof shall be considered an Obligation

( I ) Dealer will pay all indebtedness arising from advances by Secured Party on Dealer's behalf for the purchase of inventory, indebtedness shall include the principal amount of such advances, plus charges as agreed to between the parties from time to time, in accordance with the following

( i )   Secured Party shall from time to time announce charges which Dealer may accept or reject

( ii )   Any statements of account furnished by Secured Party to Dealer shall be conclusively presumed to be evidence of such prior agreement, unless objected to within ten (10) days after receipt thereof by Dealer

( iii )   If, for any reason the charge or any portion thereof included in any statement of account furnished to Dealer shall be unenforceable. Dealer shall be deemed to have, at all times, agreed to charges of no less than 15% per annum (but not greater than the maximum contract rate under applicable law)

All Obligations shall be payable by Dealer when due as indicated on any statements submitted to Dealer, and in any event upon the sale or other disposition by Dealer of any item of Inventory (unless otherwise agreed to by Secured Party). Any failure by Dealer to pay any indebtedness represented by any item of Inventory sold or otherwise disposed of by Dealer shall have the immediate effect of accelerating all Obligation then outstanding, whether or not then due and payable. Dealer agrees to pay reasonable attorney's fees as allowed by law, together with any costs incurred by Secured Party in the collection of any Obligations or the enforcement of Secured Party's remedies as provided herein. Secured Party may apply or reapply monies received in payment of Obligations, in such order of application as Secured Party may determine. In no event shall Dealer be obligated to pay any amount hereunder in excess of the maximum amount of interest permitted under applicable law

( J ) All floor plan checks, field examinations and other inspections by the Secured Party are for the benefit of Secured Party only and not to be relied on by Dealer or any third persons

5. DEFAULT - Any of the following shall constitute a Default under this Agreement:

( A ) Any breach or failure by Dealer to pay or perform any Obligations or any of its and undertakings hereunder or under any other agreement between the parties.

( B ) Any material misrepresentation by Dealer in connection with the information concerning Dealer's business and financial condition supplied to Secured Party.

( C ) Dealer's becoming insolvent, or making an assignment for the benefit of creditors: the filing of a petition in bankruptcy by or against the Dealer, the commencement of proceedings for the appointment of a receiver for Dealer or any of its property, or the commencement of proceedings for reorganization, composition or liquidation under any federal or state insolvency law.

( D ) A levy upon any of the Collateral or a revocation or repudiation of any guaranty of any Obligations.

( E ) Any change in Dealer's or any guarantor's financial condition, assets or prospects that Secured Party deems adverse, or the occurrence of any other circumstance or event as a result of which Secured party deems itself insecure.

6. REMEDIES - In the event of any Default, Secured Party shall have all of the rights and remedies of a secured party as provided in the Uniform Commercial Code and, in addition, the right to do any or all of the following:

( A ) Declare any or all unpaid Obligations immediately due and payable, and cancel any committed but unfunded advances.

( B ) Take possession of all or any of the Collateral then in the possession of Dealer or wherever found, and for that purpose Secured Party may enter the premises of Dealer who agrees to assemble and deliver the Collateral at a place reasonably convenient to Secured Party.

( C ) Deduct from the proceeds of sale of Collateral any unpaid Obligations, any attorney's fees, whether incurred through judicial proceedings or otherwise, court costs incurred by Secured Party, other expenses such as moving, storage and repair of the Collateral, and any expenses incurred for the preservation or renovation of the Collateral for purposes of sale.

7. HAZARDOUS WASTE INDEMNIFICATION - Dealer shall indemnify and hold harmless Secured Party, its parent company, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns from and against any loss, damage, cost, expense or liability directly or indirectly arising out of or attributable to the use, generation, manufacture, treatment, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance on, under or about Dealer's property or operations or property leased to Dealer, including but not limited to attorney's fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). For these purposes, the term "hazardous substances" means any substance which is or becomes designated as "hazardous" or "toxic" under any federal, state, or local law. This indemnity shall survive repayment of Dealer's obligations to Secured Party.

8. GENERAL -

( A ) It is understood and agreed, any law, custom or usage to the contrary, that Secured Party shall have the right at all times to enforce the covenants and provisions of this Agreement in strict accordance with the terms hereof, notwithstanding any conduct or practice on the part of Secured Party in refraining from so doing at any time or times, further that the failure of Secured Party at any time or times to enforce its rights under this Agreement strictly in accordance with the same, shall not result in an alteration or waiver of any of the specific terms and provisions of this Agreement, or be construed as having modified the same.

( B ) Dealer and Secured Party hereby waive any and all right to trial by jury in any action brought to enforce this Agreement or any amendment thereto or any related matters. To the fullest extent permitted by law, Dealer waives relief from any appraisement, valuation, anti-deficiency, homestead, exemption or usury laws now or hereafter in effect.

( C ) This Agreement may not be modified, altered or amended except by a further agreement in writing signed by the parties hereto. Any provision of the Agreement found upon judicial interpretation or construction to be void or prohibited by law shall not invalidate the remaining provisions hereof.

( D ) Dealer hereby irrevocably appoints Secured Party, including any of its employees as it may designate, as its true and lawful attorney-in-fact, with power of substitution, to do the following in its place and stead: to execute and deliver in the name of Dealer, financing statements, lien filings and Certificates of Title relating to Collateral, to make, execute and deliver in the name of Dealer as maker any promissory note(s) evidencing the Obligations or other amounts due Secured Party, to endorse Dealer's name upon any notes, checks, drafts, money orders and other forms of instruments made payable to Dealer and relating to Collateral, and generally to do and perform all acts and all things necessary to discharge the power hereby granted, which shall specifically include the making of any acknowledgments and affidavits necessary for the filing or recording of any or all of the foregoing. The foregoing powers are coupled with an interest and shall be considered irrevocable without prior written consent of Secured Party for such time as any Obligations may remain outstanding.

( E ) Secured Party may assign the benefits of this Security Agreement to a third party, whereupon Secured Party's assignee shall be entitled thereto, and Dealer shall thereupon be obligated to Secured Party's assignee for the payment of Obligations and the performance of all other obligations for which it is bound hereunder.

( F ) This Agreement shall be governed by the laws of the state in which Secured Party maintains its principal place of business, the state and federal courts of such state will have jurisdiction to determine any claim or dispute pertaining to this Agreement and related matters.

( G ) This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten agreements between the parties.

IN WITNESS WHEREOF, this Agreement has been duly executed by and on behalf of the undersigned this __29__ day of

__July__ 19 __97__

Apollo Fisheries Service, Inc. dba Blue Porpoise Marine
(Dealer)

By _____

Its __President__

Accepted

NationsCredit Commercial Corporation of America
(Secured Party)

By _____
(Its Authorized Agent)

CERTIFICATE

This is to certify that a meeting of the Board of Directors of __Apollo Fisheries Service, Inc.__ which meeting was duly called and properly held on __7-21-97__ pursuant to its by-laws, and at which meeting a quorum was present throughout, the following resolution was unanimously adopted

RESOLVED that the form of Security Agreement-Inventory presented in this meeting and attached hereto, is hereby approved, and the appropriate officers of this corporation are hereby authorized to execute and deliver the same for and on behalf of this corporation to __NationsCredit Commercial Corporaiton of America__ (who shall be entitled to absolutely rely upon the authority of such officers)

(CORPORATE SEAL) _____
Secretary

| 1. FILE NO. OF ORIG. FINANCING STATEMENT | 1A. DATE OF FILING OF ORIG. FINANCING STATEMENT | 1B. DATE OF ORIG. FINANCING STATEMENT | 1C. PLACE OF ...... ...NANCING |
|---|---|---|---|
| 9723860455 | 8/22/97 | | CALIFORNIA |

| 2. DEBTOR (LAST NAME FIRST) | 2A. SOCIAL SECURITY NO. FEDERAL TAX NO. |
|---|---|
| Apollo Fisheries Service, Inc. | 95-2922806 |

| 2B. MAILING ADDRESS | 2C. CITY, STATE | 2D. ZIP CODE |
|---|---|---|
| 1455 W. Morena Blvd. | San Diego, CA | 92110 |

| 3. ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST) | 3A. SOCIAL SECURITY OR FEDERAL TAX NO. |
|---|---|
| DBA Blue Porpoise Marine | |

| 3B. MAILING ADDRESS | 3C. CITY, STATE | 3D. ZIP CODE |
|---|---|---|
| 1455 W. Morena Blvd. | San Diego, CA | 92110 |

| 4. SECURED PARTY | | | 4A. SOCIAL SECURITY NO. FEDERAL TAX NO. OR BANK TRANSIT AND A B A NO. |
|---|---|---|---|
| NAME NationsCredit Commercial Corporation of America | | | |
| MAILING ADDRESS 1000 Holcomb Woods Pkwy., Ste. 240 P.O. Box 103038 | | | |
| CITY Roswell | STATE GA | ZIP CODE 30076 | |

| 5. ASSIGNEE OF SECURED PARTY (IF ANY) | | | 5A. SOCIAL SECURITY NO. FEDERAL TAX NO. OR BANK TRANSIT AND A B A NO. |
|---|---|---|---|
| NAME | | | |
| MAILING ADDRESS | | | |
| CITY | STATE | ZIP CODE | |

6.

A. ☐ CONTINUATION- The original Financing Statement between the foregoing Debtor and Secured Party bearing the file number and date shown above is continued. If collateral is crops or timber, check here ☐ and insert description of real property on which growing or to be grown in item 7 below.

B. ☐ RELEASE- From the collateral described in the Financing Statement bearing the file number shown above, the Secured Party releases the collateral described in item 7 below.

C. ☐ ASSIGNMENT- The Secured Party certifies that the Secured Party has assigned to the Assignee above named, the Secured Party's rights under the Financing Statement bearing the file number shown above in the collateral described in item 7 below.

D. ☐ TERMINATION- The Secured Party certifies that the Secured Party no longer claims a security interest under Financing Statement bearing the file number shown above.

E. ☒ AMENDMENT- The Financing Statement bearing the file number shown above is amended as set forth in item 7 below. (Signature of Debtor required on all amendments.)

F. ☐ OTHER  Amendment

7. please amend the secured party address in block 4 to read as follows:
NationsCredit Distribution Finance, Inc.
GA7-903-01-09
1355 Windward Concourse
Alpharetta, GA 30005
FEID# 56-1796724

| 8. | | CODE | 9. This Space Use of Filing Officer |
|---|---|---|---|
| Apollo Fisheries Service, Inc. | (DATE) 3-9 19 99 | | 99081C0452 |
| By: Attorney-in-Fact, L. Stephens | | 1 | |
| SIGNATURE(S) OF DEBTOR(S)    (TITLE) | | 2 | |
| NationsCredit Commercial Corporation | | 3 | |
| By: Lisa Stephens    Documentation Spec | | 4 | |
| SIGNATURE(S) OF SECURED PARTY(IES)    (TITLE) | | 5 | |

| 10. | Return Copy to | | | | CODE |
|---|---|---|---|---|---|
| NAME ADDRESS CITY AND STATE | Data File Services, Inc. P.O. Box 275 Van Nuys CA 91408-2750 | Phone Fax | 800-331-3282 818-909-4717 | | 6 7 8 9 |

FILED
SACRAMENTO, CA
MAR 11, 1999 AT 0800
BILL JONES
SECRETARY OF STATE

Uniform Commercial Code - Form UCC-7

(2) FILING OFFICER COPY - ACKNOWLEDGEMENT    Prepared with UCC Direct for Windows Data File Services, Inc., P.O. Box 275, Van Nuys, CA, 91408-0275 Tel (818) 909-2230

This FINANCING STATEMENT is presented for filing pursuant to the California Uniform Commercial Code.

| 1. DEBTOR (LAST NAME FIRST—IF AN INDIVIDUAL) Apollo-Fisheries Service, Inc. | | 1A. SOCIAL SECURITY OR FEDERAL TAX NO. 95-2922806 | |
|---|---|---|---|
| 1B. MAILING ADDRESS 1455 W. Morena Blvd. | 1C. CITY, STATE San Diego, CA | | 1D. ZIP CODE 92110 |
| 2. ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST—IF AN INDIVIDUAL) dba Blue Porpoise Marine | | 2A. SOCIAL SECURITY OR FEDERAL TAX NO. 95-2922806 | |
| 2B. MAILING ADDRESS 1455 W. Morena Blvd. | 2C. San Diego, CA | | 2D. ZIP CODE 92110 |
| 3. DEBTOR'S TRADE NAMES OR STYLES (IF ANY) | | 3A. FEDERAL TAX NUMBER | |
| 4. SECURED PARTY NAME NationsCredit Commercial Corporation of America MAILING ADDRESS 1000 Holcomb Woods Parkway Suite 240 P.O. Box 103038 CITY Roswell STATE GA ZIP CODE 30076 | | 4A. SOCIAL SECURITY NO. FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO. | |
| 5. ASSIGNEE OF SECURED PARTY (IF ANY) NAME MAILING ADDRESS CITY STATE ZIP CODE | | 5A. SOCIAL SECURITY NO. FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO. | |

6. This FINANCING STATEMENT covers the following types or items of property (include description of real property on which located and owner of record when required by instruction 4).

All of the Debtor's inventory, equipment, accounts, contract rights (including but not limited to any purchase and rental agreements), chattel paper, documents and general intangibles, of whatever kind or nature, wherever located, now owned or hereafter acquired, and all returns, repossessions, substitutions, replacements, parts, additions and accessions, thereto and thereof, and all proceeds (including but not limited to cash, instruments, chattel paper, general intangibles and accounts) and products thereof.

| 7. CHECK ☒ IF APPLICABLE | 7A. ☐ PRODUCTS OF COLLATERAL ARE ALSO COVERED | 7B. DEBTOR(S) SIGNATURE NOT REQUIRED IN ACCORDANCE WITH INSTRUCTION 5 (c) ITEM: ☐ (1) ☐ (2) ☐ (3) ☐ (4) |
|---|---|---|

8. CHECK ☒ IF APPLICABLE ☐ DEBTOR IS A "TRANSMITTING UTILITY" IN ACCORDANCE WITH UCC § 9105 (1) (n)

9. Apollo Fisheries Service, Inc.
► dba Blue Porpoise Marine DATE: 7-24-97
SIGNATURE(S) OF DEBTOR(S)

TYPE OR PRINT NAME(S) OF DEBTOR(S) Natalie Cintas Gladnick

NationsCredit Commercial Corporation of America
►
SIGNATURE(S) OF SECURED PARTY(IES) Rachel Bailey

TYPE OR PRINT NAME(S) OF SECURED PARTY(IES)

11. Return copy to:
NAME NationsCredit Commercial Corporation of America
ADDRESS P.O. Box 103038
CITY Roswell, GA 30076
STATE
ZIP CODE

Filing Officer is requested to note file number, date and hour of filing on this copy and return to the above party.

(2) FILING OFFICER COPY—ACKNOWLEDGMENT
FORM UCC-1—FILING FEE $3.00
Approved by the Secretary of State

10. THIS SPACE FOR USE OF FILING OFFICER (DATE, TIME, FILE NUMBER AND FILING OFFICER)

9723860455

FILED
SACRAMENTO, CA
AUG 22, 1997 AT 0800

BILL JONES
SECRETARY OF STATE

**EXHIBIT 3**

1355 Windward Concourse
Alpharetta, GA 30005
(678)339-9000

# BANC OF AMERICA SPECIALTY FINANCE, INC.

04/27/01 - 05/31/01   (35)

BLUE PORPOISE MARINE   06178 / 0018910
SPECIAL ASSET MARINE

| Invoice Number | Date Of Note | Plan Number | Charges Begin | Model Number | Serial Number | Original Amount | Date Last Activity | Current Activity | Present Balance | Charges Due | Principal Amounts Due Past Due | Current |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 141954 | 11/16/99 | 2144 | 8/11/00 | 200ADVEN | NTLAD570J | 28,821.10 | | | 16,907.80 | 240.57 | 16,907.80 | |
| 141954 | 11/16/99 | 2144 | 8/11/00 | 200 HP | 100119 | 11,913.30 | | | 11,913.30 | 173.74 | 11,913.30 | |
| 142389 | 11/24/99 | 2144 | 8/19/00 | 200ESCAP | NTLSC569K | 26,759.68 | 5/21/01 | 14,846.30 | | 148.47 | | |
| 142389 | 11/24/99 | 2144 | 8/19/00 | 200 HP | 100395 | 11,913.30 | 5/21/01 | 11,913.30 | | 119.13 | | |
| 142967 | 12/9/99 | 2145 | 12/9/99 | 160SPOR | NTLAV579K | 10,405.50 | 4/30/01 | 298.88 | 10,106.82 | 147.76 | | |
| 142967 | 12/9/99 | 2145 | 12/9/99 | 115 HP | 700313 | 18,300.59 | 4/30/01 | 7,904.09 | | 9.80 | | |
| 148040 | 3/27/00 | 2131 | 3/27/00 | 200 HP | 101202 | 11,913.30 | | | 11,913.30 | 173.74 | | |
| 148040 | 3/27/00 | 2131 | 3/27/00 | 200ADVEN | NTLAD675C | 31,570.87 | | | 19,657.57 | 286.67 | | |
| 151903 | 6/1/00 | 2142 | 8/28/00 | 200 HP | 101341 | 25,592.00 | 4/30/01 | 11,909.10 | | 14.89 | | |
| 159453 | 9/25/00 | 2144 | 9/21/01 | 200 HP | 102300 | 12,418.00 | 5/8/01 | 12,418.00 | | 25.87 | | |
| 159453 | 9/25/00 | 2144 | 9/21/01 | 228SEAFA | NTLCR326I | 36,346.24 | 5/8/01 | 23,928.24 | | 49.85 | | |
| 160823 | 10/20/00 | 2144 | 7/18/01 | 223TOURN | NTLBK325 | 30,999.22 | | | 18,481.22 | | | |
| 160823 | 10/20/00 | 2144 | 7/18/01 | 200 HP | 102730 | 12,418.00 | | | 12,416.00 | | | |
| 161490 | 11/1/00 | 2143 | 3/30/01 | 250 HP | 1AX106885 | 13,449.80 | | | 13,449.80 | 196.14 | | |
| 161490 | 11/1/00 | 2143 | 3/30/01 | 300MARLI | NTLEA341 | 98,040.85 | | | 71,708.35 | 1,045.75 | | |
| 161490 | 11/1/00 | 2143 | 3/30/01 | 250 HP | 19X103159 | 12,922.70 | | | 12,922.70 | 168.46 | | |
| 162750 | 11/22/00 | 2144 | 3/18/01 | 247ADVEN | NTLST338 | 45,103.62 | | | 26,833.62 | | | |
| 162750 | 11/22/00 | 2144 | 3/18/01 | 115 HP | 800507 | 9,317.70 | | | 9,317.70 | | | |
| 162750 | 11/22/00 | 2144 | 3/18/01 | 115 HP | 702198 | 8,952.30 | | | 8,952.30 | | | |
| **Totals** | | | | | | 457,106.89 | | 83,217.71 | 244,582.48 | 2,626.92 | 28,821.10 | 28,821.10 |

EXHIBIT 4

```
TPBE0351 01                    DEALER SUMMARY                      06/22/01
BLUE PORPOISE MARINE                      1010 SPECIAL ASSET MARINE        6176
1455 W MORENA BLVD                        SPECIAL ASSETS MARINE
                                          NATALIE
SAN DIEGO          CA  92110              PHONE 619-276-8862 FAX 619-276-8879
---------------------------------------------------------- DOLLARS --- UNITS
OPEN SINCE              10/25/99          OUTSTANDING      234,475       12
CREDIT LINE             F0000             APPROVALS
HIGHEST O/S EVER        589,134
HIGHEST O/S LAST 12     589,134             TOTAL         234,475       12
LAST INSPECTED          06/19/01          SAU/RTD CKS
LAST PMT DATE           06/14/01          OTHER
LAST PMT                10,106            DEMO
INSURANCE STATUS        01/02            _ EXCHANGE
INSURANCE AMOUNT (K)        800           MATURED 1-60     28,821        2
TOTAL CHARGES                             MATURED 61 +
DELQ  CHARGES                            _ CURTLMNT DUE
---------------------- MTD ---------------- YTD ------------------- 2000 ----
VOLUME                                                    761,722       17
LIQUIDATION     10,106      1     182,809      10         615,733       12
ENTER = SCRN2 F2 = END  F5 = SCRPAD  F6 = $ HIST  F8 = NXT DLR  F9 = APPROVALS
  _ NOTE  F3 = INV  F4 = ITEMS  F1 = SELECT  F7 = CHARGES  F10 = XCPTIONS
DEALER  1 OF  1
```

# SECURITY AGREEMENT AND DISCLOSURE STATEMENT
## (Simple Interest)

DATE May 1, 2000

SELLER Blue Porpoise Marine

BUYER(S) Jerry & bellen Saline

ADDRESS 1455 W Morena Blvd SD CA 92110
(Street) (City) (State) (Zip)

ADDRESS 901 Summer Holly Lane Encintas CA 92024
(Street) (City) (State) (Zip)

AGREEMENT Buyers agree that it was their decision to purchase the goods and/or services described below at the Total Sale Price rather than paying cash for the goods and/or services at the Cash Price, which is less. In return for Seller financing for Buyers the purchase of the goods and/or services described below, Buyers each individually and together promise and agree as follows:

59-3010000 1 89-1-2

| Complete Description of the Goods and Work to be Done | Cash Price (Including Tax) |
|---|---|
| New 1999 Albemarle /320 Express XWR3211RE899 | 182000.00 |
| 1999 Caterpillac Twin YB 3116 TA Diesel | |

**SECURITY INTEREST.** Buyers hereby grant to Seller a security interest in the goods described above, and proceeds from the goods, including insurance proceeds, to secure payment of all amounts due and performance of the other terms of this agreement.

| ANNUAL PERCENTAGE RATE The cost of Buyers' credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost Buyers. | Amount Financed The amount of credit provided to Buyers or on Buyers' behalf. | Total of Payments The amount Buyers will have paid after Buyers have made all payments as scheduled. | Total Sale Price The total cost of Buyers' purchase on credit, including Buyers' downpayment of $18000.00 |
|---|---|---|---|---|
| 8.5 % | $ 178710.20 | $ 165049.00 | $ 343759.20 | $ 361759.20 |

Buyers' payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 240 | $1432.33 | May 31, 2000 |
| | $ | Monthly Starting |

**Security:** Buyers are giving a security interest in the goods or property being purchased.

**Late Charge:** If any part of a payment is late, Buyers will be charged $10.00

**Prepayment:** If Buyers pay off early, Buyers will not have to pay a penalty.

See the contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties, and security interests.

## ITEMIZATION OF THE AMOUNT FINANCED

*Some part of these charges may be paid to or retained by the Seller.

| | | |
|---|---|---|
| Cash price excluding taxes ..................................................................... $ 182549.00 (1) | | |
| Sales tax .............................................................................................. $ N/A (2) | | |
| Cash price plus taxes (1+2) | $ 182549.00 (3) | |
| To public officials for filing fees | $ 500.00 (4) | |
| To insurance company for credit life insurance ......................... *$ N/A (5) | | |
| To insurance company for credit disability insurance .................. *$ WITH (6) | | |
| To insurance company for property insurance ............................ *$ N/A (7) | | |
| Total insurance (5+6+7) | *$ N/A (8) | |
| Cost of service contract paid to provider named below ............... *$ N/H (9) | | |
| To _____ for _____ | *$ N/H (10) | |
| Total of above (3+4+8+9+10) ............................................. | $ 183049.00 (11) | |
| Trade-in (description) ......................................................... $ N/A (12) | | |
| Cash downpayment ............................................................ $ 18000.00 (13) | | |
| Total downpayment (12+13) | $ 18000.00 (14) | |
| Amount financed (11 minus 14) | $ 165049.00 | |

**Insurance (Optional):** Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless a Buyer signs and agrees to pay the additional cost, which will be included in the Amount Financed. If a Buyer signs, this insurance will be procured by the Seller.

| Type | Premium | Term (Months) | Signature |
|---|---|---|---|
| Credit Life | ☐ Single Coverage $ N/A ☐ Joint Coverage $ N/A | | I want credit life insurance. N/A ___ Signature ___ Date |
| Credit Disability | $ | | I want credit disability insurance. N/A ___ Signature ___ Date |

**CREDIT LIFE AND DISABILITY INSURANCE:** If Buyers elect credit insurance coverage and are accepted by the insurance company, the terms and conditions will be as described in the NOTICE OF PROPOSED GROUP INSURANCE, or in the policies or certificates issued by the insurance company. The original amount of the decreasing term credit life insurance will not exceed $ _____. Credit disability insurance payments will equal the monthly payment amount but will not be more than

| Cash down payment | $ 18000 ox | (13) |
| Total down payment (12+13) | | $ 18000 oo |
| Amount financed (11 minus 14) | | $ 165049 o2 |

**Insurance (Optional):** Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless a Buyer signs and agrees to pay the additional cost, which will be included in the Amount Financed. If a Buyer signs, this insurance will be procured by the Seller.

| Type | Premium | Term (Months) | Signature |
|------|---------|---------------|-----------|
| Credit Life | ☐ Single Coverage $ | | I want credit life insurance. _____ Signature _____ Date |
| | ☐ Joint Coverage $ | | |
| Credit Disability | $ | | I want credit disability insurance. _____ Signature _____ Date |

CREDIT LIFE AND DISABILITY INSURANCE: If Buyers elect credit insurance coverage and are accepted by the insurance company, the terms and conditions will be as described in the NOTICE OF PROPOSED GROUP INSURANCE, or in the policies or certificates issued by the insurance company. The original amount of the decreasing term credit life insurance will not exceed $ _____ . Credit disability insurance payments will equal the monthly payment amount but will not be more than $ _____ Insurance Company: _____

**LIFE AND DISABILITY INSURANCE MAY NOT COVER THE ENTIRE AMOUNT DUE UNDER THIS AGREEMENT. BUYERS MUST SEE THEIR POLICY OR CERTIFICATE FOR EXACT COVERAGE.**

PROPERTY INSURANCE: Buyers agree to keep the goods described above insured to Seller's satisfaction. If property insurance must be obtained at the time this agreement is signed, Buyers may purchase it through any insurance company or agent of their choice. If Buyers fail to keep the goods satisfactorily insured during the term of this agreement, Buyers hereby authorize Seller, at Seller's option, to purchase any required insurance. Seller may either request immediate reimbursement from Buyers for the cost of such insurance or may add the insurance premium to the unpaid balance of this agreement. If the insurance premium is added to the unpaid balance of this agreement, interest will be charged on the insurance premium at the Annual Percentage Rate disclosed in this agreement, and Buyers agree to pay the insurance premium with interest in equal installments along with the payments shown on the payment schedule.

Buyers understand and agree that if Seller or its assignee purchases any property insurance, Seller will be acting in its own interest and will not be representing the Buyers' interests. Buyers further understand and agree that the purchased insurance will not contain any liability coverages, may cover only the Seller's interest in the property, may have deductible amounts different than those in any Buyer provided insurance, and may be more expensive than equivalent insurance which Buyers could purchase through their own sources. Buyers agree that Seller can purchase such insurance with coverage that will be retroactive to the date Buyers' insurance terminated. Buyers understand and agree that Seller may receive compensation or reimbursement in connection with such insurance.

Any property insurance available through Seller does not include liability insurance of any kind.

Unless a charge is shown for property insurance, none is sold under this agreement. Property insurance is available through Seller at a cost of $ _____ for a term of _____ months. Insurance Company: _____

A Service Contract is not required. This is an option which costs the amount indicated below. The Service Contract is more fully described in the contract or certificate describing it. Please read those documents before signing this contract. If you elect this option by signing below, its cost is included in the Amount Financed under this Agreement.

Service Contract: $ _____ Deductible _____ Term: _____ mos. Cost: $ _____

Coverage Provider _____

**Purchaser(s) want a Service Contract.**

Purchaser _____

RECEIPT OF GOODS AND PROMISE TO PAY: Buyers agree that they have received the goods and/or services described above, and have accepted delivery of the goods in good condition. Buyers promise to pay to the Seller at its address shown above the Amount Financed plus interest at the Annual Percentage Rate until paid in full in consecutive monthly installments as indicated above. Payments hereon shall be applied in the following order: first to monthly insurance premiums (if any), next to the finance charge accrued through actual payment date, next to the amount financed necessary to bring the account up to date, next to late charges (if any), next to the amount advanced for insurance (if any), next to returned check charges (if any), and then to the amount financed. Buyers understand that the finance charge will accrue each day that Buyers' amount financed is outstanding. Buyers further understand that the disclosures set forth above are based on the assumption that Buyers make all payments when due and in the amount due. If Buyers pay early, the finance charge will be less than the amount shown above. If Buyers pay late, the finance charge will be more than the amount shown above. If Buyers pay early, however, Buyers must continue to make payments in the amount shown above on the scheduled due date. Any amount financed unpaid after the final due date will accrue finance charge at the Annual Percentage Rate until paid in full.

CHARGE FOR LATE PAYMENT: If any part of any payment is more than 10 days late, Buyers agree to pay a late charge of $10.00

CHARGE FOR DISHONORED CHECKS: In the event payment is made by a check which is dishonored, Buyers agree to pay to Seller a fee of $15.00.

FAILURE TO COMPLY WITH THE TERMS OF AGREEMENT: Buyers agree that if they fail to comply with any of the terms of this agreement, Seller, subject to any right that the Buyers may have to cure a default, may require Buyers to immediately pay the entire unpaid balance of this agreement, including but not limited to the unpaid amount financed and accrued and unpaid finance charge to date of payment.

PAYMENT OF AGREEMENT AHEAD OF SCHEDULE: Buyers understand that they may pay the outstanding agreement balance, which is the remaining balance of Amount Financed, plus accrued and unpaid Finance Charge to date of prepayment, at any time.

**NOTICE TO THE BUYER: 1. Do not sign this agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of this agreement. 3. You can prepay the full amount due under this agreement at any time. 4. If you desire to pay off in advance the full amount due, the amount which is outstanding will be furnished upon request. 5. Seller intends to sell this contract to a financial services company. Seller may share in a part of the finance charge you will pay.**

Buyers agree that at the time they signed they received a copy of this SECURITY AGREEMENT.

Accepted _____ X _____ 5-1-0? (SEAL)
Signature of Buyer

By _____ (SEAL) X _____ 5-1-0? (SEAL)
Signature and Title _____ Signature of Buyer

Person signing immediately below subjects his or her interests in the above described property to the terms of this security agreement, but does not promise personally to repay any debt secured by this agreement.

_____ (SEAL)

**NOTICE: THE TERMS OF THIS AGREEMENT ARE CONTAINED ON BOTH SIDES OF THIS PAGE.**

CALIFORNIA IB R/P-MARINE, FORM 005-3838 1/00
DISTRIBUTION: WHITE — BRANCH COPY; GREEN — FILE COPY; CANARY—SELLER COPY; PINK—2 BUYER'S COPIES

RULES FOR INTERPRETING THIS AGREEMENT: Paragraph headings are for convenient reference only and are not to be interpreted as a complete summary of each paragraph. The word "Buyers" may mean one or more persons who are purchasing goods and/or services from the Seller and financing the purchase by this agreement. The word "Seller" includes any person or corporation to whom this agreement may be sold or assigned. Buyers agree that all of the terms of their agreement with Seller are contained in this written document. However, if this agreement is secured by a Ship's Preferred Mortgage, those terms will control to the extent that they conflict with this agreement. Buyers agree that if any part of this agreement should happen to violate an applicable law, all other parts of this agreement shall not be affected.

ACTIONS BY SELLER NOT AFFECTING OBLIGATIONS OF BUYERS: Buyers agree that Seller may take any of the following actions at any time and any number of times, without notice, without relieving Buyers of any of their obligations under this agreement: extend the time of payment, postpone or delay collection, take a new promissory note or obligation for or in connection with this agreement, reduce the amount payable under this agreement, change the time or place for payment, change the number of parties to this agreement or the obligations of some of the parties to this agreement, release any security for this agreement, fail to enforce any security interest taken in connection with this agreement, release any party to this agreement from any further obligation, agree not to sue any party for collection of this agreement, or assign this agreement at any time to another person or corporation.

OBLIGATIONS OF BUYERS REGARDING GOODS: Buyers agree that they will keep possession of all goods and not dispose of any of them nor permit or cause any other person to claim any rights in the goods. Buyers agree to keep the goods repaired and in good condition. Buyers agree that any loss of or damage to any goods is at their risk and is their responsibility regardless of the cause of the loss or damage. Buyers agree that none of the goods will be attached to any real estate (including buildings) in such a way that it cannot be easily removed without damaging the goods or the real estate (including buildings). Buyers agree not to change permanently the place where the goods are stored or harbored without the prior approval of the Seller. Buyers agree that if Seller requests, they will make all of the goods available to the Seller at any reasonably convenient place the Seller may designate. Buyers agree to comply with all registration, licensing, tax and title laws applicable to any of the goods. Buyers agree that none of the goods will be used in any manner contrary to any law. Buyers agree that they will not sell or otherwise transfer ownership of the goods securing this agreement without immediately paying the Seller all amounts still owing on this agreement. If Buyers wish to sell or transfer the goods securing this agreement to someone who agrees to assume the balance of this agreement, Buyers must obtain the written approval of the Seller to the assumption, or the Seller may ignore the assumption, and Buyers will remain primarily-liable for the balance owing.

RIGHTS OF SELLER REGARDING GOODS: If Buyers fail to fully comply with any of the terms of this agreement, Seller shall have, but will not be limited to, the right to do any of the following upon notice and subject to Buyers' right to cure in accordance with state law: enter any house or other building and on any real estate, take possession of goods wherever they may be found, and sell any of the goods for cash or credit. Buyers agree that any notice required shall be reasonable if mailed to them at their last known address at least 10 days prior to the time of sale. Buyers agree that if the information is not available at the time of signing this agreement, Seller may insert identifying numbers or marks of the goods in the space for description of goods on the other side of this document.

ATTORNEY FEES AND COURT COSTS: Buyers agree to pay court costs and Seller's reasonable attorney fees, as allowed by law, after default and referral to an attorney who is not a salaried employee of the Seller or his assignee.

Warranties Seller Disclaimer: Buyers understand that Seller makes no express or implied warranties of merchantability or of fitness for a particular purpose covering the property unless the property is for personal, family, or household use and the Seller either makes a written warranty or at the time of sale or within 90 days thereafter enters into a service contract with the buyers which applies to the property. The provision does not affect any warranties covering which may be provided by the manufacturer of the property or any warranties which may be provided by applicable state law.

An implied warranty of merchantability generally means that the property is fit for the ordinary purpose for which such property is generally used. A warranty of fitness for a particular purpose is a warranty that may arise when the Seller has reason to know the particular purpose for which Buyers require the property and buyers rely on the Seller's skill or judgment to furnish suitable property.

GOVERNING LAW: The terms of this agreement shall be governed by the laws of California.

## NOTICE
**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**The preceding NOTICE applies only to goods or services obtained primarily for personal, family, or household use. In all other cases, Buyers will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyers (debtors) may have against the Seller, or against the manufacturer of the property obtained under this contract.**

---

The printing contained in this box is not part of Buyers' agreement.

### ASSIGNMENT BY SELLER

For value received, we hereby assign within contract and all our right, title and interest in it and in its collateral to Banc of America Specialty Finance, Inc. (Assignee), and warrant all of the following: 1) that this contract is the result of a sale of our own property or services; 2) that we have full and perfect title to and right to convey this contract free of any encumbrance, lien, or any interest of third parties of any nature whatsoever; 3) that all services and installation work in connection with this contract will be completed according to the contract at the time this contract is sold to the Assignee; 4) that this contract accurately and correctly reflects a genuine, bona fide sale and the price and terms thereof, and is valid and in compliance with any applicable installment sales law or other applicable state or federal law or administrative regulation; 5) that the goods or services covered by this contract have been unconditionally accepted by the parties to the contract; 6) that at the time this contract is sold to the Assignee, the goods and services are in the possession of the obligor and are the identical goods and services described in or related to the contract; 7) that the amount due from the obligor is not disputed or subject to any set-off, deduction, credit or counterclaim; 8) that there is no undisclosed delinquency; 9) that the downpayment is correctly stated in the contract; 10) that we have received cash, or its proper equivalent, for the downpayment, no part of which was loaned to us by us, directly or indirectly, to the Buyers; 11) that this contract is the entire and sole contract between us and the obligor as to the sale of goods or services evidenced herein; 12) that there is no undisclosed agreement, concession or litigation of any nature affecting this contract; 13) that all the parties to this contract were competent at the time it was executed; 14) that there are no valid defenses in law or equity to this contract as it exists in the hands of the Assignee after this conveyance; and 15) that all signatures on this contract are genuine. If any of the foregoing warranties are untrue, regardless of Assignee's knowledge or lack of knowledge or reliance thereon, Assignor hereby unconditionally agrees to repurchase the documents on demand from Assignee for the balance remaining unpaid plus any expense of collection, repossession, foreclosure, transportation, or storage, attorney fees, and court costs incurred by Assignee less any customary refund by Assignee of unearned finance charges. FURTHER, if a "With Recourse" assignment is initialed below, we engage that the within contract will be paid according to its tenor and that if it is not, we shall pay it to the Assignee or to any subsequent assignee, regardless of the order in which the assignments are made. If a "With Limited Recourse" assignment is initialed below, we engage that the within contract will be paid according to its tenor for the period shown below, and that if it is not, we shall pay it to the Assignee or to any subsequent assignee, regardless of the order in which the assignments are made. If a "Repurchase" assignment is initialed below, we engage that if Assignee or any subsequent assignee repossesses any of the collateral on this contract, we will repurchase the collateral for the unpaid

according to the contract at the time this contract [...] to the Assignee; 4) that this contract accurately and [...] reflects a genuine, bona fide sale and the price and terms thereof, and is valid and in compliance with any applicable installment sales law or other applicable state or federal law or administrative regulation; 5) that the goods or services covered by this contract have been unconditionally accepted by the parties to the contract; 6) that at the time this contract is sold to the Assignee, the goods and services are in the possession of the obligor and are the identical goods and services described in or related to the contract; 7) that the amount due from the obligor is not disputed or subject to any set-off, deduction, credit or counterclaim; 8) that there is no undisclosed delinquency; 9) that the downpayment is correctly stated in the contract; 10) that we have received cash, or its proper equivalent, for the downpayment, no part of which was loaned by us, directly or indirectly, to the Buyers; 11) that this contract is the entire and sole contract between us and the obligor as to the sale of goods or services evidenced herein; 12) that there is no undisclosed agreement, concession or litigation of any nature affecting this contract; 13) that all the parties to this contract were competent at the time it was executed; 14) that there are no valid defenses in law or equity to this contract as it exists in the hands of the Assignee after this conveyance; and 15) that all signatures on this contract are genuine. If any of the foregoing warranties are untrue, regardless of Assignee's knowledge or lack of knowledge or reliance thereon, Assignor hereby unconditionally agrees to repurchase the documents on demand from Assignee for the balance remaining unpaid plus any expense of collection, repossession, foreclosure, transportation, or storage, attorney fees, and court costs incurred by Assignee less any customary refund by Assignee of unearned finance charges. FURTHER, if a "With Recourse" assignment is initialed below, we engage that the within contract will be paid according to its tenor and that if it is not, we shall pay it to the Assignee or to any subsequent assignee, regardless of the order in which the assignments are made. If a "With Limited Recourse" assignment is initialed below, we engage that the within contract will be paid according to its tenor for the period shown below, and that if it is not, we shall pay it to the Assignee or to any subsequent assignee, regardless of the order in which the assignments are made. If a "Repurchase" assignment is initialed below, we engage that if Assignee or any subsequent assignee repossesses any of the collateral on this contract, we will repurchase the collateral for the unpaid balance of the contract, or its fair market value, whichever is higher. If a "Without Recourse" assignment is initialed below, this Assignment is without recourse.

With Recourse _____
           Seller initials

With Limited Recourse for first
_____ months of contract
                      Seller initials

Repurchase Agreement _____
                 Seller initials

Without Recourse _____
             Seller initials

Seller/Assignor _____

By _____

Date _____

CALIFORNIA IS RIP-MARINE, FORM 005-3938   1/00



725 SOUTH FIGUEROA STREET SUITE 2800 LOS ANGELES, CA 90017-5406 213.488.7100 F: 213.629.1033

June 27, 2001

Jennie L. La Prade
213.488.7216
jlaprade@pillsburywinthrop.com

VIA FACSIMILE (619) 276-8879
& FIRST-CLASS MAIL

Ms. Natalie Gladnick, President
Apollo Fisheries Service, Inc.
Blue Porpoise Marine
1455 W. Morena Boulevard
San Diego, CA 92110

> Re:  Notice of Default, Demand For Payment and Demand For Turnover of
> Collateral Under Security Agreement-Inventory dated July 29, 1997
> ("Agreement")

Dear Ms. Gladnick:

We represent Banc of America Specialty Finance, Inc. ("Specialty Finance"), successor
in interest to NationsCredit Commercial Corporation of America ("Specialty Finance"),
in connection with credit that Specialty Finance extended to Apollo Fisheries Service,
Inc. dba Blue Porpoise Marine ("Customer"), pursuant to a Security Agreement-
Inventory dated July 29, 1997 ("Agreement").

The Customer is in default under the above-referenced Agreement as a result of a number
of breaches of the Agreement, including those itemized in Specialty Finance's letters to
you dated January 30, and March 5, 2001.

As a result of these defaults, many of which remain uncured, Specialty Finance hereby
demands that Customer immediately pay any and all outstanding obligations under the
Agreement. As of June 22, 2001, the Customer owes principal in the amount of
$234,475.00, plus accrued and unpaid interest, charges, curtailments and costs of
collection. Please remit these amounts immediately to Specialty Finance.

Additionally, Specialty Finance hereby demands that Customer assemble and turn over to
Specialty Finance the boats that Specialty Finance has financed on Customer's behalf.
Attached hereto is a list of boats that Customer is instructed to surrender.

Please let us know by tomorrow afternoon whether Customer will voluntarily surrender
the boats that Specialty Finance has financed. If we do not hear from you by that time or



the Customer declines to voluntarily surrender the boats, Specialty Finance will have no choice but to pursue its legal remedies

We would appreciate your directing all future communications concerning this matter to the undersigned. We look forward to your prompt reply.

Very truly yours,

PILLSBURY WINTHROP LLP

Jennie L. La Prade

Enclosure

cc:    Mr. Kenneth Daigrepont

```
TPBE0352 01               DEALER ITEM DETAIL              PAGE    1 OF   1
BLUE PORPOISE MARINE           1010 SPECIAL ASSET MARINE              6176
O/S      12    234,475 APPROVALS                   TOTAL   12    234,475
```

```
INVOICE PLAN  DATE      UNIT NAME    MODEL    SERIAL      AMOUNT        STATUS
 141954 2144 11/16/99 BOAT        208ADVEN NTLAD570J   16,907.80P MATURED  05/01
 141954 2144 11/16/99 ENGINE      200 HP    100119     11,913.30 MATURED  05/01
 148040 2131 03/27/00 BOAT        208ADVEN NTLAD675C   19,657.57P
 148040 2131 03/27/00 ENGINE      200 HP    101202     11,913.30
 160823 2144 10/20/00 BOAT        223TOURN NTLBK325    18,481.22P
 160823 2144 10/20/00 ENGINE      200 HP    102730     12,418.00
 161490 2143 11/01/00 BOAT        300MARLI NTLEA341    71,708.35P
 161490 2143 11/01/00 ENGINE      250 HP   1AX105885   13,449.80
 161490 2143 11/01/00 ENGINE      250 HP   1BX103159   12,922.70
 162758 2144 11/22/00 BOAT        247ADVEN NTLST338    26,833.62P
 162758 2144 11/22/00 ENGINE      115 HP    800507      9,317.70
 162758 2144 11/22/00 ENGINE      115 HP    702198      8,952.30
```

```
    ENTER = FWD      F1 = SELECT      F8 = NEXT DEALER      F2 = TERMINATE
    F7 = BKW         F3 = SUMMARY     F9 = APPROVALS        F4 = MAIN MENU
END OF DISPLAY
```



**EXHIBIT 3**

```
TPBE0352 01                     DEALER ITEM DETAIL              PAGE   1 OF   1
BLUE PORPOISE MARINE            1010 SPECIAL ASSET MARINE               6176
O/S   12   234,475 APPROVALS                        TOTAL   12   234,475

INVOICE PLAN  DATE     UNIT NAME  MODEL    SERIAL      AMOUNT        STATUS
 141954 2144 11/16/99 BOAT      208ADVEN NTLAD570J  16,907.80P MATURED  05/01
 141954 2144 11/16/99 ENGINE    200 HP    100119    11,913.30  MATURED  05/01
 148040 2131 03/27/00 BOAT      208ADVEN NTLAD675C  19,657.57P
 148040 2131 03/27/00 ENGINE    200 HP    101202    11,913.30
 160823 2144 10/20/00 BOAT      223TOURN NTLBK325   18,481.22P
 160823 2144 10/20/00 ENGINE    200 HP    102730    12,418.00
 161490 2143 11/01/00 BOAT      300MARLI NTLEA341   71,708.35P
 161490 2143 11/01/00 ENGINE    250 HP   1AX105885  13,449.80
 161490 2143 11/01/00 ENGINE    250 HP   1BX103159  12,922.70
 162758 2144 11/22/00 BOAT      247ADVEN NTLST338   26,833.62P
 162758 2144 11/22/00 ENGINE    115 HP    800507     9,317.70
 162758 2144 11/22/00 ENGINE    115 HP    702198     8,952.30


    ENTER = FWD        P1 = SELECT     F8 = NEXT DEALER     F2 = TERMINATE
    F7 = BKW           F3 = SUMMARY    F9 = APPROVALS       F4 = MAIN MENU
  END OF DISPLAY
```